**Cheryl TOM, individually and as administratrix of the estate of Wayne Lee Tom, deceased, Plaintiff–Appellant,**

v.

**Dawn E. VOIDA, individually and in her official capacity as a Police Officer of the City of Indianapolis, Paul Annee, individually and in his official capacity as Chief of Police, Indianapolis Police Department and City of Indianapolis, Defendants–Appellees.**

No. 91–2293.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 11, 1992.

Decided May 8, 1992.

**954**

Richard Kammen, argued, Katharine C. Liell, McClure, McClure & Kammen, Indianapolis, Ind., for Cheryl Tom.

Frances W. Hardy, Marion County Legal Div., John C. Ruckelshaus, Ruckelshaus, Roland, Hasbrook & O'Connor, Douglas J. Webber, City–County Legal Div., Andrew P. Wirick, Corp. Counsel, argued, Office of the Corp. Counsel, City Counsel Legal Div., Indianapolis, Ind., for Dawn E. Voida.

Frances W. Hardy, Marion County Legal Div., Douglas J. Webber, City–County Legal Div., Andrew P. Wirick, Corp. Counsel, Office of the Corp. Counsel, Indianapolis, Ind., for Paul Annee and City of Indianapolis.

Before CUMMINGS, Circuit Judge, and WOOD, Jr., and ESCHBACH, Senior Circuit Judges.

ESCHBACH, Senior Circuit Judge.

This case began when a police officer benevolently approached an eighteen-year-old whom she did not suspect of any wrongdoing. For various reasons, this innocent encounter progressively escalated into a leisurely pursuit on foot, a rough-and-tumble chase, an attempted handcuffing, a violent physical struggle, another chase, another violent struggle, and ultimately a fatal shooting of the citizen. The question is whether the circumstances surrounding the escalation to violence give rise to a § 1983 suit on behalf of the decedent's estate. The end result of this encounter was undeniably tragic; a citizen who was initially suspected of no crime was killed. Analyzing the encounter step by step, however, we conclude that the victim's actions, not the officer's reactions, precipitated every step of the escalation to violence; the plaintiff has not adduced any evidence to indicate that the police officer acted impermissibly at any point. Accordingly, we affirm the district court's grant of summary judgment to the officer and to the other defendants.

### Facts [1]

On December 10, 1988, Dawn E. Voida, an Indianapolis police officer, was investigating a report that shots had been fired in a certain neighborhood. While driving in her car, she noticed Wayne Lee Tom, an eighteen-year-old male, fall off his bicycle and remain on the ground. Tom was lying

---

1. On the defendants' motion for summary judgment, we take the facts in the light most favorable to the plaintiff. *Thornton v. Evans,* 692 F.2d 1064, 1074 (7th Cir.1982). These facts are primarily based on Voida's testimony to the Indianapolis Police Department Firearms Review Board ("R. 103" hereafter), Voida's deposition testimony ("Voida Depo." hereafter), and Officer Briley's police report of the incident ("Briley Report" hereafter). Although the plaintiff claims that Voida's various statements were contradictory, the plaintiff does not illustrate any serious contradictions, and the district court did not flag any. On our independent review of the record, we found Voida's statements to be consistent in all major respects.

down with his arms and legs in the air, "like a bug." Voida Depo. at 118; R. 103 at 4. Voida did not suspect Tom of any crime, but she was concerned that he might have hurt himself or had some medical problem, and wished to help him. Voida Depo. at 122–25; R. 103 at 4. She stopped her vehicle to investigate. As Voida approached Tom on foot while in full uniform, Tom immediately got up, grabbed the bicycle, and began to walk away. Voida Depo. at 121; R. 103 at 4. Voida asked Tom if he was alright, but Tom did not respond and continued to walk away for approximately 35 seconds. He glanced back at Voida all the while. Voida Depo. at 125–26; R. 103 at 1. Voida followed him, but Tom began to walk faster. Finally, Voida said, "Hey, wait a minute." Tom then looked "sharply" over his shoulder at Voida, threw down the bicycle, and ran away. Although Voida repeatedly ordered Tom to stop, he did not. Voida Depo. at 127; R. 103 at 1.

At this point, Voida noticed that the bicycle was fairly nice, and that she was in a neighborhood where property crimes, drug abuse, and alcohol abuse were common. Based on these facts, Voida now suspected that the bicycle was stolen. R. 103 at 6–7; Voida Depo. at 140. In addition, Tom had just fled from a law enforcement officer. Voida began to pursue him. Voida Depo. at 135; R. 103 at 6–7. She followed him for a few blocks, and over at least one fence. Eventually, Tom slipped on a patch of ice, allowing Voida to catch him. She kneeled on Tom and attempted to handcuff him. For approximately 25 seconds, they struggled violently, with Tom repeatedly hitting Voida's head on the concrete. Voida feared for her life and screamed for help. Witnesses heard her scream and saw some of the struggle. Tom ultimately broke free and continued his flight. Voida Depo. at 145–47; R. 103 at 2, 11–14; Briley Report at 7.

By this time, Tom had committed a felony—battery on a police officer, I.C. § 35–42-2-1 (Burns 1991 Supp.)—as well as a misdemeanor—fleeing a law enforcement officer. I.C. § 35–44-3-3 (Burns 1991 Supp.). So Voida continued to pursue Tom. Voida Depo. at 149; R. 103 at 16. When she caught up to him, they struggled some more. During this second physical confrontation, witnesses saw Tom continue to hit Voida's head and beat her. Briley Report at 7; Voida Depo. at 157; R. 103 at 9. With Tom gaining an advantage in this struggle, Voida apparently realized that she would not be able to subdue Tom solely by hand. But Voida did not have her nightstick with her. Voida Depo. at 137, 158. Moreover, her left arm was incapacitated, preventing her from grabbing her chemical repellant without exposing her right side where her gun was holstered, to Tom's grasp. Voida Depo. at 158–59; R. 103 at 2–3, 9. With no indication where her backup was, Voida finally decided that she would have to pull her gun to subdue Tom and prevent him from gaining access to the gun himself. She pulled away from Tom so that he would not be able to get to the gun when she pulled it. While sitting or crouching on the ground, Voida pulled her revolver and three times said, "Please. Don't make me shoot you." Voida Depo. at 162; R. 103 at 3. Tom moved toward Voida anyway, and Voida fired an errant shot. Tom stepped back and then lunged at Voida again, with his arms outstretched. She fired another shot, which pierced Tom's chest. The wound killed him. An initially innocent encounter ended in death.

In the subsequent investigation, additional information came to light. The police determined that the serial number of the bicycle had been obliterated, indicating that the bicycle may have been stolen. Briley Depo. at 59–60. In addition, Tom was found to have been legally drunk, and he had a marijuana pipe in his pocket. Finally, Tom had both a juvenile and an adult felony history. R. 103 at 17.

The district court decided this case after the investigation was concluded. Cheryl Tom, the administratrix of Wayne Lee Tom's estate, had brought suit against Officer Voida, Indianapolis police chief Paul A. Annee, and the City of Indianapolis. In the two federal claims in her complaint, she claimed that the defendants violated the decedent's Fourth Amendment rights as protected through the Fourteenth Amend-

ment to the United States Constitution.[2] Voida allegedly violated those rights by seizing Tom without a reasonable suspicion or probable cause, and by employing excessive force in pursuing him and ultimately killing him. The district court granted the defendants summary judgment on these federal claims and dismissed the pendent state claims without prejudice.

As we see it, Voida made three distinct sets of decisions in her encounter with Tom: 1) first were Voida's decisions to press an encounter with Tom: when he was lying on the ground, she decided to approach him and ask if he was alright; when he refused to answer her questions, she decided to follow him slowly; and when he threw down the bicycle and fled, she decided to order him to stop, and then pursue him; 2) next was her decision, after catching up with him on the ice, to cuff him and seize him physically; and 3) last were her decisions to subdue him: when he escaped from the first physical confrontation, she decided to continue to pursue him, and when he rushed at her, in the midst of the second of two physical confrontations and after she had already fired one shot, she decided to fire again. The plaintiff argues that some of these actions violated Tom's constitutional rights and entitle her to damages in and of themselves. The plaintiff also argues that because some of these actions violated Tom's constitutional rights, Voida herself created the need for force, so that her ultimate decision to shoot Tom was tainted by prior unconstitutional acts. Appellant's Br. at 36–38; see Gilmere v. City of Atlanta, Georgia, 774 F.2d 1495, 1501–1502 (11th Cir.1985) (when officer improperly beat the suspect-decedent and this improper use of official power created need for use of deadly force, officer could be held liable for shooting even if officer had "a moment of legitimate fear"), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654, 476 U.S. 1124, 106 S.Ct. 1993, 90 L.Ed.2d 673 (1986). Because we hold that Voida did not violate Tom's constitutional rights at any point in this series of

events, we need not distinguish between these two theories.

*1. Voida's Decisions to Question and Follow Tom*

■ The plaintiff argues that Voida created this entire incident by overreacting to circumstances which demonstrated little more than teen panic. According to the plaintiff, Voida should never have insisted on following Tom and continuing to ask him questions after he got off the ground and showed no need of help. Even if Voida's various decisions to question and follow Tom were unjustified, they did not constitute a "seizure" and, as a result, are not subject to any Fourth Amendment scrutiny. Voida's initial questioning of Tom was "a voluntary encounter initiated by non-coercive police questioning, requiring no suspicion at all." *United States v. High,* 921 F.2d 112, 115 (7th Cir.1990); *see also Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Because Tom was completely free to leave this encounter, *High,* 921 F.2d at 115, *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991), the Fourth Amendment was not implicated.

■ But, the plaintiff argues, if Tom was free to leave this voluntary non-coercive encounter, then how could Voida have been justified in following Tom and telling him to "wait a second"? Appellant's Br. at 19. Likewise when Tom threw down his bicycle and ran away, how could Voida have been justified in ordering Tom to stop and in pursuing him? The answer is that Voida did not need any justification for following Tom and ordering him to stop; those actions do not constitute a "seizure" under the Fourth Amendment. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of the citizen may we conclude that a 'seizure' has occurred." *Terry,* 88 S.Ct. at 1879 n. 16. This test is objective; "a person has been 'seized' within the meaning of the Fourth

---

**2.** The plaintiff also argued that the defendants violated the decedent's substantive due process rights. She hardly mentions that claim on appeal. In any case, we agree with the district court that that claim lacked merit. *See* Order at 16–17.

Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) (footnote omitted); *see also Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983). In *California v. Hodari D.,* — U.S. —, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991), the Court held that the objective test of *Mendenhall* states a necessary, but not a sufficient, condition for seizure. A seizure requires not only that the reasonable person feel unfree to leave, but also that the subject actually yield to a show of authority from the police or be physically touched by the police. *Id.,* 111 S.Ct. at 1550. Under this test, a police officer who chases a fleeing suspect unsuccessfully has not seized that person. Similarly, an officer who yells "Stop, in the name of the law!" at a fleeing person who continues to flee has not effected a seizure. *Id.*

*Hodari D.* governs this case. Although Voida followed Tom slowly, ordered him to stop, and then followed him more quickly, she did not seize Tom until she overtook him on the ice and physically touched him. As a result, even though Voida was *attempting* to execute an investigatory stop, her acts do not need to be justified by reasonable suspicion, let alone probable cause.

*2. The Attempted Cuffing*

The most difficult issue in this case is whether Voida was justified in attempting to handcuff Tom after he fled from her attempted *Terry* stop. The plaintiff argues that Voida was attempting to arrest Tom, and that the district court thus erred by requiring Voida to have only a reasonable suspicion of criminal activity. Appellant's Br. at 23–24. The plaintiff also argues that Voida used excessive force in attempting to cuff Tom. Although this issue arguably raises some thorny questions, we affirm the district court on two alternative grounds.

**A. The Cuffing Was Justified as Incident to an Investigatory Stop**

The district court held that Voida's action was a justifiable attempt to enforce an investigatory stop. To this end, the district court first held that "[a]s a matter of law, dropping the bicycle and running are specific facts that would raise a reasonable suspicion of criminal activity" justifying the stop. Order at 12. Then, the district court found that the attempted cuffing was a reasonable means of executing the investigative stop. Order at 12–13. Finally, the district court assumed that because the attempted cuffing was reasonable, it did not convert the investigatory stop into a formal arrest. We agree with all three prongs of the district court's analysis.

■ The first question is whether Voida had a reasonable suspicion of criminal activity to justify stopping Tom. When Tom first saw Voida approaching, he immediately grabbed the bicycle. As he walked away, he glanced back at Voida again and again. Finally, after Voida had called out to him, he looked at her sharply, discarded the bicycle, and fled. Voida noticed that the bicycle was "fairly nice" and that she was in a high-crime neighborhood; she testified that at this point she suspected that the bicycle might have been stolen. We agree with the district court that this suspicion was reasonable. Yet the plaintiff seizes on Voida's admission that she did not suspect that Tom had committed any crimes *before* she saw him throw the bicycle down and flee. The plaintiff thus argues that Voida relied solely on Tom's flight in forming her reasonable suspicion, and that this is impermissible. But the plaintiff focuses on the wrong time frame. Voida's lack of earlier suspicions are not relevant in determining whether she had a reasonable suspicion at the time she made the decision to cuff him. In addition, the plaintiff cannot benefit from *United States v. Sterling,* 909 F.2d 1078, 1082 (7th Cir. 1990), which noted that "officers cannot use [ ] departure as the single additional event that ripens their preexisting concerns to the 'founded suspicion' that a *Terry* stop

requires." [3] In *Sterling*, the police had indicated to the defendant that she was free to leave; the issue was whether *departing* could contribute to the officers' formation of reasonable suspicion. In the present case, Tom did not simply depart; he threw down the bicycle and *fled.* And although the Supreme Court has not decided whether flight alone may support a finding of reasonable suspicion,[4] flight is certainly a relevant and probative factor. *See, e.g., United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 1573 n. 3, 84 L.Ed.2d 605 (1985) (evasive actions relevant in determining whether officers had reasonable suspicion); *United States v. Cardona–Rivera*, 904 F.2d 1149, 1153 (7th Cir.1990) (same).

Given that Voida was justified in making a brief investigatory stop, the next question is whether Voida's concomitant use of force was reasonable under the Fourth Amendment. If not, then the plaintiff could be entitled to damages for this act alone. Furthermore, if Voida surpassed the permissible bounds of a *Terry* stop, then her act might have been a formal "arrest" for which she did not have probable cause. In that case, Voida's attempt to arrest Tom illegally could have tainted Voida's subsequent use of force. *See Gilmere*, 774 F.2d at 1501–1502.

■ To answer these questions, we must evaluate whether Voida's attempt to cuff Tom was an objectively reasonable use of force in light of the totality of the circumstances. These circumstances include factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443 (1989). We believe that although Tom did not appear to be dangerous at this time, Voida's minimal use of force was reasonable under the circumstances. Tom had already disobeyed her repeated orders to stop. And he fell to the ground because he had slipped on the ice, not because Voida had touched him. Voida merely kneeled on Tom and tried to cuff him. There is no evidence in the record to suggest that this action was violent or threatening in any way; Voida merely tried to restrain Tom. Voida acted reasonably in attempting to handcuff a fleeing person about whom she had a reasonable suspicion of criminal activity. *United States v. Taylor*, 716 F.2d 701, 708–709 (9th Cir.1983) (handcuffing during *Terry* stop justified when defendant "had disobeyed an order to raise his hands, and he made furtive gestures"); *United States v. Purry*, 545 F.2d 217, 220 (D.C.Cir. 1976) (handcuffing justified when "Purry attempted to frustrate further inquiry").

■ Moreover, this reasonable attempt to restrain Tom did not convert the *Terry* stop into an arrest. Voida's attempt to handcuff Tom was a measured use of force, could have been brief, and was appropriate to accomplish the purposes of an investigatory stop.[5] *See United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985) (detention was an investigative stop even though officer approached defendant's car with gun drawn and pointed in air); *United States v. Glenna*, 878 F.2d 967, 972–73 (7th Cir.1989) (handcuffing does not necessarily convert *Terry* stop into arrest); *Taylor*, 716 F.2d at 709 (same). Tom's attempt to flee from her necessitated her attempt to restrain him. The plaintiff cannot complain that Officer Voida took extensive steps to investigate when Tom's own actions necessitated those steps. *See United States v. Sharpe*, 105 S.Ct. at 1577 (Marshall, J.,

---

**3.** Otherwise, we noted in *Sterling*, the freedom to depart from a voluntary encounter with the police would be illusory; departing would allow the police greater freedom to search.

**4.** *See Hodari D.,* 111 S.Ct. at 1549 n. 1 (reserving the question whether the police may question someone who does nothing more than "scatter in panic upon the mere sighting of the police"); *but see Michigan v. Chesternut*, 486 U.S. 567, 108

S.Ct. 1975, 1981, 100 L.Ed.2d 565 (1988) (Kennedy and Scalia, JJ., concurring) ("respondent's unprovoked flight gave the police ample cause to stop him"). We need not reach this question either.

**5.** We note that Voida testified that she was "attempting to gain control" of Tom, not that she was attempting to arrest him. R. 103 at 2.

concurring in judgment) (intrusive *Terry* detention justified by defendants' evasive actions).[6]

### B. Voida Had Probable Cause to Justify an Arrest

■ Even if Voida's attempt to restrain Tom was an arrest, we affirm the district court on an alternative ground. When Tom threw down the bicycle and fled, we believe, as did the district court, that Voida had a reasonable suspicion that Tom was engaged in criminal activity. And when Tom defied Voida's orders to stop and continued to flee in apparent panic, we believe that Voida had probable cause to arrest Tom for stealing the bicycle and for resisting a law enforcement officer. Put differently, Tom's continued flight from Voida ripened her reasonable suspicion into probable cause.

The plaintiff again argues that Tom's flight from Voida cannot constitute grounds for forcibly seizing him, because Tom was entitled to walk away from the original encounter, at which point Voida did not suspect Tom of any criminal activity. But the plaintiff focuses on an earlier and irrelevant time period; as we held above, Voida did have a reasonable suspicion of criminal activity after Tom threw down the bicycle and began to flee. The question then is whether Tom's defiance of her order to stop and continued flight gave her probable cause for an arrest when before she had only a reasonable suspicion. Here we touch on a central problem in the law of investigative stops: do citizens have a right to refuse to respond to questions posed during investigative stops based merely on reasonable suspicion?[7] Answering this question in either the affirmative or the negative poses problems. If citizens do have a right to refuse to answer, then the *Terry* stop is a rather weak law enforcement device, useful only against the suspect who does not make any attempt to assert his or her rights. But if citizens do not have a right to refuse to answer, then the *Terry* stop becomes an extraordinarily powerful law enforcement device, for it permits law enforcement officers to bootstrap their reasonable suspicion of criminal activity justifying an investigative stop into probable cause justifying a search or an arrest based solely on the suspect's refusal to respond to the investigative stop. Citizens are thus placed in a dilemma: "individuals who chose to remain silent would be forced to relinquish their right not to be searched ..., while those who chose not to be searched would be forced to forgo their constitutional right to remain silent." *Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 2636–37, 61 L.Ed.2d 343 (Brennan, Marshall, and Stevens, JJ., dissenting) (1979).[8]

---

**6.** The plaintiff also argues that even if Voida did not use excessive physical force in attempting to stop Tom, her continued pursuit of him was overzealous and thus went beyond the limited bounds authorized for investigatory stops. Appellants' Br. at 19. Voida pursued Tom zealously because Tom fled zealously.

**7.** *See Terry,* 88 S.Ct. at 1886 (White, J., concurring) ("[G]iven the proper circumstances, ... it seems to me the person may be briefly detained against his will while pertinent questions are directed to him. Of course, the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation.").

**8.** Despite repeated references to this problem, the Supreme Court has never resolved it. *See Terry,* 88 S.Ct. at 1879 n. 16 (declining to address the constitutionality of "an investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or interrogation");

*Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 2641 n. 3, 61 L.Ed.2d 357 (1979) (reserving question "whether an individual may be punished for refusing to identify himself in the context of a lawful investigatory stop which satisfies Fourth Amendment requirements"); *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 1860 n. 10, 75 L.Ed.2d 903 (1983) (reserving question whether statute making it a crime to refuse to identify one's self to peace officer who so requests and has reasonable suspicion to do so permits arrest without probable cause). Various dissenters have argued that a refusal to answer questions posed during a *Terry* stop cannot permit the officer to elevate his or her reasonable suspicion into probable cause. *See, e.g., Michigan v. DeFillippo,* 99 S.Ct. at 2635–36 (Brennan, Marshall, and Stevens, JJ., dissenting) ("individuals accosted by police on the basis merely of reasonable suspicion have a right not to be searched, a right to remain silent, and, as a corollary, a right not to be searched if they choose to remain silent"). For the sake of clari-

The plaintiff repeatedly argues that Voida placed Tom in this dilemma, and that by following him, Voida punished him for exercising his right not to respond to the investigatory stop. But the plaintiff mischaracterizes Tom's reactions. He did not listen to Voida's question and announce his refusal to respond to it. Nor did he calmly depart from her. Rather, he threw down his bicycle and fled from her, even after she had repeatedly ordered him to stop. Whether or not suspects have a right to refuse to respond to an investigative stop, a suspect's actual *flight* from an officer may certainly provide information to ripen an officer's preexisting suspicions into probable cause. Even Justice Brennan, one of the justices who has argued that a suspect in an investigative stop has a right to remain silent, *see supra* n. 9, has accepted the distinction between flight and a refusal to submit to more extensive questioning. In *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 1861, 75 L.Ed.2d 903 (1983), Justice Brennan asserted in his concurrence that "States may not authorize the arrest and criminal prosecution of an individual for failing to produce identification or further information on demand by a police officer" when the officer has only a reasonable suspicion of criminal activity. To the contrary, police officers with a reasonable suspicion "must allow the person to leave after a reasonably brief period of time unless the information they have acquired during the encounter has given them probable cause sufficient to justify an arrest." *Id.*, 103 S.Ct. at 1863. "Of course," Justice Brennan continued, "some reactions by individuals to a properly limited *Terry* encounter, e.g. violence toward a police officer, in and of themselves furnish valid grounds for arrest. *Other reactions, such as flight, may often provide the necessary information, in addition to that which the officers already possess, to constitute probable cause." Id.* at 1863 n. 4

ty, we note that the Supreme Court has resolved the analogous question with respect to consensual encounters: a refusal to cooperate in a consensual encounter does not furnish the officers with reasonable suspicion. *Bostick*, 111 S.Ct. at 2387.

(emphasis added). A number of appellate decisions have held precisely that. In *United States v. Morgan*, 936 F.2d 1561, 1569 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992), for example, the police followed the defendant's car and attempted a *Terry* stop at the curb based on their reasonable suspicion that he was involved in criminal activity. When the defendant exited the car, the officer said, "Just hold it right there" and "Don't run." The defendant fled nevertheless. The court held that "the facts establishing the officer's reasonable suspicion combined with the furtive actions and flight of Mr. Morgan [ ] sufficiently support a finding of probable cause to arrest." *See also United States v. Bell*, 892 F.2d 959, 967 (10th Cir.1989) (reasonable suspicion ripened into probable cause when suspect being detained by narcotics agents "dropped his bag and ran down the concourse"), *cert. denied,* 496 U.S. 925, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990); *United States v. Martinez–Gonzalez*, 686 F.2d 93, 100 (2nd Cir.1982) ("The event that transformed the agents' reasonable suspicion into probable cause was Martinez's own manifestation of guilt evidenced by his flight from the agents back into the apartment when the agents approached him to talk to him."). Tom's uncomfortable glances toward Officer Voida, his abandonment of a fairly new bicycle in a high-crime area, his defiance of her order to stop, and his obvious determination to flee from any contact with her gave Voida probable cause to arrest him for stealing the bicycle. And once Tom defied Voida's orders to stop, she may also have had probable cause to arrest him for "resisting law enforcement," in violation of I.C. § 35–44–3–3 (Burns 1991 Supp.).[9] Voida acted permissibly.

### 3. The Second Pursuit and Shooting

The plaintiff also argues that Voida used excessive force by pursuing Tom ov-

9. The statute provides that "A person who knowingly or intentionally ... [f]lees from a law enforcement officer after the officer has, by visible or audible means, identified himself and ordered the person to stop; commits resisting law enforcement...." Voida herself justified cuffing Tom on this theory. R. 103 at 6.

erzealously after their first physical encounter, and ultimately by shooting him. Voida was clearly justified in continuing to pursue Tom. By this time, she had more than probable cause to arrest Tom. He had actually committed crimes against her by fleeing from her, I.C. § 35–44–3–3, and by committing battery against her. I.C. § 35–42–2–1 (Burns 1991 Supp.).

█ Voida was also justified in shooting Tom. The plaintiff argues that the evidence is conflicting on two relevant points: whether Tom violently beat Voida, and whether Tom moved aggressively toward Voida after the first shot. Thus, the plaintiff suggests that Tom never did beat Voida, and that Tom was surrendering, not attacking, when he stretched his arms out toward Voida. In making this argument, the plaintiff claims that Voida did not adduce any evidence to support her claim that Tom beat her. Appellant's Br. at 15. Here the plaintiff distorts the record, ignoring considerable medical and testimonial evidence that entirely corroborated Voida's story.[10] The report of the doctor who examined Voida after the incident noted the following injuries: a twisted and tender left arm, a scratched neck, hair pulled out, a 6 by 3 centimeter lump on her head, a crimson and swollen right cheek, a crimson and swollen right earlobe and cartilage, a bruise on her back, bruises on her right tibia, and an effusion on her right knee. Plaintiff's Ex. B. These injuries are consistent with Voida's statements regarding the two fights. In addition, an officer who investigated the entire incident interviewed five witnesses to various portions of the fight between Voida and Tom. According to the officer's report, some of the witnesses "saw the suspect kicking Officer Voida in the head, face and body" during the first physical confrontation. Other witnesses saw "the suspect . . . striking the officer in the face . . . and . . . kicking Officer Voida" during the second physical confrontation. Briley Report at 7. In suggesting that Voida fabricated her story, the plaintiff completely ignores these witnesses.

The plaintiff also suggests that Tom's arms were outstretched in surrender, not in attack, and that therefore he did not pose a threat of serious bodily injury at the time Voida fired the second shot. But this is pure speculation; the plaintiff simply suggests that "Most people do not attack someone for the first time after they have been shot at, especially when they are unarmed." Appellant's Br. at 16. The plaintiff had no witness who could testify that Tom was surrendering, no scientific evidence that Tom was retreating from Voida at the moment she shot him, and, of course, no evidence from the decedent himself. Based on Voida's injuries and testimony, the district court did not err in concluding that Tom posed a threat to Voida.

█ At oral argument, the plaintiff argued that her lack of affirmative evidence should not be dispositive of this issue; she relies instead on "inherent contradictions" in Voida's testimony. Despite the plaintiff's repeated reference to these contradictions, her brief does not illustrate any major discrepancies. Voida made four separate statements about the incident which are in the record: to the doctor who examined her injuries just after the incident, to the police officer who investigated the incident, to the Firearms Review Board, and in her deposition for this case. We find these statements to be consistent. To the extent that there are minor ambiguities in Voida's statements, these ambiguities do not relieve the plaintiff of the burden of presenting affirmative evidence to support her case. *See Branion v. Gramly,* 855 F.2d 1256, 1263 (7th Cir.1988) ("Disbelief is not evidence of the opposite of the thing discredited"), *cert. denied,* 490 U.S. 1008, 109 S.Ct. 1645, 104 L.Ed.2d 160 (1989); *Zayre Corp. v. S.M. & R. Co.,* 882 F.2d 1145, 1148 (7th Cir.1989).

█ Because the plaintiff did not present any affirmative evidence to support her contentions, the only remaining question is whether the district court erred in concluding that Voida did not use excessive force as a matter of law. Under *Gra-*

---

**10.** The appellees have properly objected to the appellants' statement of the case, Appellees' Br.

at 8–11, which included other misleading statements as well.

**962**

*ham v. Connor,* 109 S.Ct. at 1872, we look to the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." More specifically, "deadly force may be used if necessary to prevent escape, ... if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, ... and if, where feasible, some warning has been given." *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). On the other hand, deadly force is inappropriate when "the suspect poses no immediate threat to the officer and no threat to others." *Id.* Voida justifiably believed that Tom posed an immediate threat to her, and she gave him more than adequate warning. Tom had already inflicted serious physical harm on Voida in two separate encounters. He was rushing at her again. Voida could not have subdued Tom through lesser means, as she did not have her nightstick with her and she feared that reaching for her chemical repellant would expose her weapon to Tom's grasp. Voida fired one shot at Tom which did not hit him, but he insisted on lunging at her again. Voida was justified in concluding that Tom could not be subdued except through gunfire.[11] *Klein v. Ryan,* 847 F.2d 368 (7th Cir.1988) (officers reasonably used deadly force against unarmed and non-threatening forcible burglary suspect to prevent flight).

Finally, because Voida did not violate Tom's constitutional rights, there is no basis for liability against the other defendants either. *City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have

*authorized* the use of constitutionally excessive force is quite beside the point.").

### *Conclusion*

In sum, none of Voida's actions prior to her physical contact with Tom is subject to any scrutiny under the Fourth Amendment. Further, Voida was justified in attempting to handcuff Tom because she then had a reasonable suspicion that he was engaged in criminal activity. In addition, Tom's continued flight from her, even after she had ordered him to stop, had given her probable cause to arrest him. Voida was justified in following him after the initial physical encounter because by this time he had committed at least two crimes. And she was ultimately justified in using deadly force because Tom had already inflicted serious bodily injury on her and threatened to continue doing so. Accordingly, we AFFIRM the district court's grant of summary judgment to the defendants.

---

11. Despite these facts, the plaintiff argues that Tom had not committed any crime at all, and that Tom posed no threat of serious bodily injury because Voida initiated the contact while he was running away. Appellant's Br. at 29. Here again the plaintiff focuses on the wrong time period. When Voida made the decision to use deadly force, Tom was not fleeing. He was actively and violently resisting arrest.