**ESTATE OF Timothy J. FRANK, Brian D. Frank, Personal Representative, Plaintiffs,**

v.

**CITY OF BEAVER DAM, Robert L. Schumacher, Ronn Sauer, Michael Marshall, Dodge County, Linda S. Thieme, Jeffrey A. Schlegel and Gwyn K. Meyer, Defendants.**

No. 93–C–0955.

United States District Court, E.D. Wisconsin.

March 29, 1996.

Richard F. Rice, Fox & Fox, S.C., Madison, WI, for Plaintiffs.

John M. Moore and David J. Pliner, Bell, Metzner, Gierhart & Moore, S.C., Madison, WI, for Defendants.

## DECISION AND ORDER

WARREN, Senior District Judge.

Before the Court is the defendants' Motion for Summary Judgment to dismiss Dodge County and Jeffrey A. Schlegel, Linda S. Thieme and Gwyn K. Meyer, the remaining defendants, from the above-captioned matter. For the following reasons, the defendants' Motion is GRANTED and this case is DISMISSED.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The Court put forth the factual background of this lawsuit in detail in its prior Orders dated March 23, 1995, September 21, 1995 and October 13, 1995. The factual background is incorporated by reference herein. By way of brief explanation, Timothy Frank was arrested at about 1:00 a.m. on October 25, 1992 by Beaver Dam police and was transported to the Dodge County Jail. At approximately 9:00 a.m., Mr. Frank was found dead in his cell; he had strangled himself with a television cable. The Estate of Timothy Frank, filed the instant Complaint on September 1, 1993, seeking compensatory and punitive damages, as well as attorney fees and costs, for alleged negligent supervision and Due Process violations, including deliberate failure to provide adequate medical and custodial care and to properly train and supervise officers.

On March 23, 1995, the Court dismissed defendants Robert L. Schumacher, Ronn Sauer and Michael Marshall ("the Beaver Dam defendants") from defending this action based on the doctrine of qualified immunity.

On September 21, 1995, the Court dismissed the claims against the City of Beaver Dam. On August 24, 1995, Dodge County and Jeffrey A. Schlegel, Linda S. Thieme and Gwyn K. Meyer ("the Dodge County defendants") filed a Motion for Summary Judgment and a Motion for Stay of Discovery. On October 13, 1995, the Court denied the defendants' Motion for a Stay of Discovery and set in place a scheduling order allowing the estate of plaintiff to take the depositions of the governmental actors involved and any other potential witness and imposed a date of December 22, 1995, for the plaintiff to respond to the defendants' Motion for Summary Judgment. The Court found this case provided a unique situation where, despite the doctrine of qualified immunity and case law, minimal discovery was necessary with regard to the Dodge County defendants in order to provide the plaintiff a fair opportunity to respond to defendants' Motion. On December 21, 1995, via facsimile, the plaintiff requested an extension to respond which was granted. On January 11, 1996, plaintiff filed a Response to defendants' Motion for Summary Judgment and on January 23, 1996, the defendants filed a Reply. Therefore, this case is fully briefed and ready for resolution by this Court.

The findings of fact are the following and pursuant to Local Rule 6.05(d) (E.D.Wis.), facts proposed by the defendants and not objected to by the plaintiff are adopted by the Court. As previously stated, this lawsuit arises out of Timothy J. Frank's suicide in the Dodge County Jail on October 25, 1992. Mr. Frank was arrested on charges of burglary and possession of marijuana at approximately 1:00 a.m. and transported to the Dodge County Jail where he was booked at approximately 4:29 a.m. (Defendants Proposed Findings of Fact (DPFOF) ¶¶ 1–2.) Dodge County Corrections Officer Jeffrey Schlegel, who has been an officer with Dodge County for approximately five years, was the booking deputy on duty. (DPFOF ¶ 3.)

Schlegel was advised by Ronn Sauer, a Beaver Dam police officer, that Frank had been arrested for burglary and possession of marijuana and that Frank had been drinking. Sauer provided Schlegel with a slip from Hillside Hospital and informed Schlegel that Frank had passed out but that the hospital could not determine the cause. (DPFOF ¶ 4.) Sauer further advised Schlegel to keep an eye on Frank because Frank had exhibited extreme mood swings, and that Frank indicated he wanted to be with his mother. (Plaintiff's Proposed Findings of Fact (PPFOF) ¶ 2.) Officer Schlegel believed that Frank had been drinking because he had bloodshot eyes, but Frank did not stagger or slur his speech or exhibit any other signs of intoxication. Moreover, Frank did not appear to be despondent or depressed. (DPFOF ¶ 5; Schlegel Aff. ¶¶ 5–6.)[1] During the booking process, Frank yelled at Officer Schlegel. (PPFOF ¶ 3.)

Pursuant to Sheriff's Department policy, Schlegel prepared a Jail Booking Sheet and Medical Intake Report on Frank, which included questioning Frank about his health. Frank responded directly and clearly to Schlegel's questions. Based on his observations, Schlegel recorded in the Medical Intake Report that Mr. Frank did not appear to be intoxicated, did not appear to be at risk of suicide or assaultive behavior, and did not appear to be mentally ill. Schlegel recorded Officer Sauer's comment that Frank had exhibited "extreme mood swings" in the presence of Officer Sauer on the way to the Dodge County Jail. (DPFOF ¶ 6, Schlegel Aff. ¶ 7, Exh. A.) On the inmate questionnaire portion, Schlegel noted that Frank had been in detox in April of 1992, had attempted to commit suicide or been treated for suicidal tendencies in 1985, had passed out prior to the booking, had heart problems, alcoholism and drug addiction, and noted that Frank thought "he is mental." (PPFOF ¶ 4, Exh. A.)

---

**1.** The Court acknowledges that plaintiff "objects" to this finding of fact by defendants, however, plaintiff does not adequately respond to defendants' proposed findings of fact and does not cite to any evidence in the record to establish that defendants' proposed finding of fact is inaccurate. Plaintiff cites a statement made by Officer Sauer, but this does not respond to or refute the affidavit of Schlegel and his observations. When the plaintiff fails to respond to defendants' findings of fact, the defendants' findings of fact will be adopted by the Court.

After changing into a jail uniform, Frank was escorted to a cell in the medium security area of the jail by Officers Sauer and Schlegel. The medium security area consists of two individual cells adjoining a dayroom, which contains a table, a clock and a television set. (DPFOF ¶ 7.) Gwyn Meyer, a Dodge County correctional officer, was also on duty, but was not directly involved with booking Frank because she was busy with another inmate. Meyer accompanied Schlegel and Sauer when Frank was placed in his cell between 5:00 and 5:15 a.m. Meyer observed that Frank was very quiet and cooperative and did not appear despondent or intoxicated. (DPFOF ¶ 8.) Meyer heard Sauer inform Schlegel that Frank had exhibited extreme mood swings and when Meyer asked Frank a question he failed to respond. (PPFOF ¶ 5.) Meyer's shift ended at 6:00 a.m. and she states Frank never threatened suicide, caused a disturbance, or otherwise did anything to call attention to himself during her shift. (DPFOF ¶ 9; Meyer Aff. ¶ 4.)

The other cell in the medium security area was occupied by inmate John Desjarlais. Both men were locked in their respective cells for the remainder of the night. Their individual cells were unlocked to serve breakfast in the cellblock dayroom at approximately 6:50 a.m. (DPFOF ¶ 10.) Both Schlegel and correctional officer Linda S. Thieme, who relieved Meyer at 6:00 a.m., served breakfast to Frank and Desjarlais. Neither Schlegel nor Thieme spoke with Frank at that time, but both he and Desjarlais appeared to be fine. (DPFOF ¶ 11; Schlegel Aff. ¶ 11; Thieme Aff. ¶¶ 2–3.) Schlegel's shift ended at 7:00 a.m., but he continued to work until 7:30 a.m. He picked up the breakfast trays from the medium security area at approximately 7:15 a.m. He observed Frank on the cellblock telephone but did not speak with him, however, he observed that Frank did not appear angry or distressed. (DPFOF ¶ 12.) During Schlegel's shift, Frank did not make any requests or threats, cause any disturbances, or do anything to lead Schlegel to believe that Frank might be a suicide risk. (DPFOF ¶ 12; Schlegel Aff. ¶ 14.)

The Dodge County Detention Cell Check Log shows that Thieme inspected the medium security cellblock at 7:30 a.m., 8:15 a.m. and 9:00 a.m. (DPFOF ¶ 13.) At approximately 9:10 a.m., Thieme heard bars rattling. She called to the medium security area over the intercom and inmate Desjarlais informed her that Frank had hung himself. Thieme and Officer Rodger Mattson, who had relieved Schlegel at 7:00 a.m., immediately rushed to Frank's cell, where they found him sitting half in and half out of his cell with the television coaxial cable around his neck. (DPFOF ¶ 14.) Thieme and Mattson began CPR. Thieme called an ambulance and Frank was taken to the hospital where he ultimately died. (DPFOF ¶ 15.)

The following policies were in effect on October 25, 1992 and state in pertinent part:

[Policy number 100]

SUBJECT: EMERGENCY COMMITMENTS & SUICIDE PREVENTION

. . . .

3. HEALTH SCREENING UPON ADMISSION

A. As a routine part of the booking process, the booking Officer will complete the Dodge County Detention Medical Intake Report for each newly admitted inmate.

B. During the screening process, the booking Officer will record any information that he/she feels is relevant in regards to the mental/emotional condition of the inmate. This information may be based on the booking Officer's observations or information received from the arresting officer. Example of indicators to look for may be:

1. The inmate appears to be depressed/suicidal.

2. Inmate appears to behave in a manner that is bizarre or out of touch with reality.

3. Inmate is extremely agitated.

4. Inmate is unusually confused, very withdrawn, or noncommunicative.

C. If, as a result of the screening process, it is determined that an inmate may be a suicide risk or has emotional difficulties, the jailer should then contact

the shift supervisor or Jail Lieutenant. It will then be determined whether to do an Emergency Detention or to place the inmate where he can be monitored closely. . . .

## II. *LEGAL STANDARD*

Summary judgment is no longer disfavored under the Federal Rules. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) ("Summary judgment procedure is properly regarded as an integral part of the Federal Rules as a whole which are designed 'to secure the just, speedy and inexpensive determination of every action.'") Indeed, Federal Rule of Civil Procedure 56 requires a district court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there is a *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Local 1545, United Mine Workers of Am. v. Inland Steel Coal Co.,* 876 F.2d 1288, 1292 (7th Cir.1989). Once this burden is met, the non-moving party must "go beyond the pleadings" and designate specific facts to support each element of its cause of action, showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Local 1545,* 876 F.2d at 1293. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Koclanakis v. Merrimack Mut. Fire Ins. Co.,* 899 F.2d 673, 675 (7th Cir.1990), or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985), and both parties must produce proper documentary evidence to support their contentions. *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990); *Local 1545,* 876 F.2d at 1293.

In evaluating a motion for summary judgment, the Court must draw all inferences in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir.1989). "However, we are not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) (citation omitted).

 The doctrine of qualified immunity provides that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." *Baxter v. Vigo County School Corp.,* 26 F.3d 728, 737 (7th Cir.1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Qualified immunity is a judicially created doctrine intended to balance the citizen's statutory or constitutional right against the reality that few "persons will enter public service if such service entails the risk of personal liability for one's official decision." *Donovan v. City of Milwaukee,* 17 F.3d 944, 949 (7th Cir.1994). As such the doctrine provides an *"immunity from suit* rather than a mere defense to liability." *Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (emphasis in original)). The availability of qualified immunity "turns on the 'objective legal reasonableness' of the actions taken by the defendants." *Hall v. Ryan,* 957 F.2d 402, 404 (7th Cir.1992) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)).

■ When immunity from suit is sought by invocation of the doctrine of qualified immunity, the plaintiff has the burden of establishing the existence of a clearly established right. *Liebenstein v. Crowe*, 826 F.Supp. 1174, 1183 (E.D.Wis.1992) (citing *Abel v. Miller*, 824 F.2d 1522, 1534 (7th Cir.1987)). That burden requires the plaintiff to "offer either a closely analogous case or evidence that the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts." *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir.1993) (citing *Rice v. Burks*, 999 F.2d 1172, 1173–74 (7th Cir.1993)). *See also McDonald v. Haskins*, 966 F.2d 292 (7th Cir.1992) (holding a gun to the head of a child and threatening to pull the trigger is plainly excessive force, so closely analogous case is not needed to put police officer on notice). Examination of a summary judgment motion based on the doctrine of qualified immunity requires a two-part analysis: (1) Does the alleged conduct violate the plaintiff's constitutional rights?, and (2) If those rights were violated, were the constitutional standards clearly established at the time in question? *Sherman v. Four County Counseling Center*, 987 F.2d 397, 401 (7th Cir.1993). "The test is an objective one, requiring that 'the plaintiff . . . demonstrate that a reasonable official, confronted with the specific facts at issue and the law in effect at the time, would have known that his conduct violated the plaintiff's [ ] constitutional rights.'" *Lowrance v. Pflueger*, 878 F.2d 1014, 1017 (7th Cir.1989) (citing *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir.1989)). *Accord Anderson v. Creighton*, 483 U.S. 635, 636–41, 107 S.Ct. 3034, 3037–40, 97 L.Ed.2d 523 (1987). "At the summary judgment stage, the defendants cannot prevail if [plaintiff] can present a version of the facts that is supported by the evidence and under which defendants would not be entitled to qualified immunity." *Hall*, 957 F.2d at 404.

### III. *DISCUSSION*

#### A. *LEGAL STANDARD*

■ As discussed in the Court's prior order dated March 23, 1995 and repeated verbatim herein, while the Eighth Amendment's prohibition against cruel and unusual punishment protects those who have been convicted of crimes and are in the custody of the government, *Ingraham v. Wright*, 430 U.S. 651, 664, 97 S.Ct. 1401, 1408, 51 L.Ed.2d 711 (1977), the Fourteenth Amendment right to substantive due process serves as the primary source of protection from abusive governmental conduct for pretrial detainees. *See Graham v. Connor*, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1988); *Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1982); *Hall v. Ryan*, 957 F.2d 402, 404–05 (7th Cir.1992). Because it is recognized that "the due process rights of a pretrial detainee are at least as great as the Eighth Amendment protection available to a convicted prisoner," *Hall*, 957 F.2d at 405 (citing *Revere*, 463 U.S. at 244, 103 S.Ct. at 2983), it is useful to understand the requirements for an Eighth Amendment violation in analyzing a substantive due process claim. *Salazar v. City of Chicago*, 940 F.2d 233, 239–40 (7th Cir.1991). As noted by the Seventh Circuit in *Salazar*:

> " . . . we do not mean to imply that the Eighth Amendment governs the standard of conduct of a jailer toward a pretrial detainee. It does not because the Eighth Amendment prohibits only cruel and unusual punishment, while the Fourteenth Amendment does not allow jailers to punish pretrial detainees at all, no matter how humane or common the punishment might be. But since both amendments prohibit punishment to a certain degree, a necessary question to answer to determine whether a particular act violates a pretrial detainee's right to be free from punishment or a convicted prisoner's right to be free from cruel or unusual punishment is, 'Is the act punishment?' . . . [T]o be punishment an act must be intentional or criminally reckless. Punishment is punishment, and there is no reason why the term should mean two different things in the Eighth and Fourteenth Amendment contexts."

*Id.* at 239–40.

■ Under both the Eighth and Fourteenth Amendment, the failure of law

enforcement officials to provide appropriate medical care only rises to the level of "punishment" if they exhibit "deliberate indifference" to the complainant's serious medical needs. *Id.* at 238–40. To establish "deliberate indifference," a complainant must demonstrate that prison officials were aware of imminent danger and consciously or knowingly refused to do anything about it. *Id.* at 239; *Campbell v. Greer,* 831 F.2d 700, 702 (7th Cir.1987). "Deliberate indifference" may be manifested, for example, by a prison guard's intentional delay in providing the prisoner access to medical treatment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). However, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Id.* at 105–06, 97 S.Ct. at 291–292 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)); *Palko v. Connecticut,* 302 U.S. 319, 323, 58 S.Ct. 149, 151, 82 L.Ed. 288 (1937). Claims alleging negligence, gross negligence, or ordinary recklessness (as such terms are used in tort cases) are not actionable under the Eighth or Fourteenth Amendment because they lack sufficient deliberateness. *Salazar,* 940 F.2d at 238; *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). In short, "only intentional or criminally reckless conduct implicates the due process clause" or, in circumstances involving a prisoner, the Eighth Amendment, as there exists "little room for doubt that the deliberate indifference standard applies to pretrial detainees." *Salazar,* 940 F.2d at 238.

## B. *PARTIES' ARGUMENTS*

According to the defendants, Officers Schlegel, Thieme and Meyer are shielded from liability in this case under the doctrine of qualified immunity because, based on the information available to them at the time of Mr. Frank's suicide in the Dodge County jail, there did not appear a "strong likelihood" that Frank would commit suicide. Defendants argue that nothing Mr. Frank said or did in their presence could reasonably be said to have put them on notice that he presented an imminent danger of suicide.

Moreover, no reasonable person, standing in the shoes of the three correctional officers, would have know that his or her conduct exhibited deliberate indifference to Mr. Frank's serious medical needs. And because Mr. Frank's constitutional rights were not violated, the plaintiff's custom, policy and practice claim against Dodge County is moot and can be dismissed without further analysis.

The plaintiff argues that Schlegel, Thieme and Meyer violated Mr. Frank's due process rights and are not entitled to qualified immunity because Beaver Dam Police Officer Sauer informed Schlegel that Frank had exhibited extreme mood swings and that information elicited from Mr. Frank during his intake demonstrated a person who was clearly a suicide risk. Plaintiff argues that the three correctional officers should have known that Frank was unquestionably a suicide risk and should have afforded proper surveillance procedures in compliance with the policies of the Dodge County jail.

## C. *ANALYSIS*

As previously indicated, the court must grant summary judgment in favor of Officers Schlegel, Thieme and Meyer if there exists no genuine issue as to any material fact and they are entitled to judgment as a matter of law; in other words, if the Court finds, after viewing the evidence in a light most favorable to the plaintiff, that no relevant facts are in dispute and that the officers have presented a valid qualified immunity defense, then they need not defend this action. The officers are shielded from liability under the doctrine of qualified immunity unless it is shown that (1) Mr. Frank had a "clearly established" Fourteenth Amendment right to not have his medical needs treated with "deliberate indifference" at the time he was booked and detained in the Dodge County Jail (2) his Fourteenth Amendment rights were violated because the defendants consciously or knowingly failed to respond to a strong likelihood that Mr. Frank was suicidal and/or in imminent danger, *and* (3) reasonable persons in the officer's shoes would have known that their conduct violated Frank's

Fourteenth Amendment rights. Each requirement will be discussed in turn.

■ First, the parties do not dispute and this Court has already found in its March 23, 1995 Order, that a pretrial detainee has a clearly established due process right not to have public officials treat his serious need for medical attention, or his suicidal tendencies, with deliberate indifference. *Hall,* 957 F.2d at 404–05. As a result, Mr. Frank's Fourteenth Amendment right to be free from punishment without due process by having his serious medical needs treated with deliberate indifference was clearly in existence as of October of 1992. Therefore, the plaintiff can meet the first prong of the three prong test.

The next question to be assessed by the Court is whether defendants Schlegel, Thieme and Meyer exhibited "deliberate indifference" to Mr. Frank's needs because they were aware of the imminent danger of suicide and deliberately or knowingly did nothing about it. The Court construing the evidence in a light most favorable to the plaintiff, finds that the statements and behavior of Mr. Frank did not put the defendants on notice that Mr. Frank presented an imminent danger of suicide. Each defendant will be discussed in turn.

■ Again, viewing the facts in a light most favorable to plaintiff, Officer Schlegel booked Mr. Frank into the Dodge County Jail. Police Officer Sauer advised Schlegel that Frank had exhibited severe mood swings on the way to jail. However, when Schlegel interviewed Frank for the Medical Intake Report, Frank responded directly and clearly to Schlegel's questions. While Frank's eyes appeared bloodshot, he did not stagger or slur his speech or exhibit any other symptoms to lead Schlegel to conclude that Frank was intoxicated. As part of the booking process, Schlegel evaluated whether Frank presented a potential risk for suicide. In talking to Frank and in observing his demeanor, Schlegel did not notice anything unusual which caused him to believe that Frank was potentially suicidal. To Schlegel, Frank did not appear to be despondent or depressed and did not display any extreme mood swings during the booking process.

Overall, Schlegel found Mr. Frank to be cooperative. During the intake, Frank informed Schlegel that he had been in "detox" in April of 1992 and that in 1985 Frank had either attempted to commit suicide or been treated for suicidal tendencies, approximately seven years ago. The intake interview further revealed that Frank experienced problems with drugs and alcohol and that Frank "thought he was mental." These indicators do not demonstrate that Frank was an imminent suicide risk, or that there existed a strong likelihood that Frank would commit suicide or otherwise endanger his own well-being, especially when Schlegel noted that Frank did not appear to be depressed, did not display any mood swings during the booking process and did not cause a disturbance.

Moreover, Frank's demeanor must be considered in the context of being subjected to arrest and detention for burglary and possession of marijuana. The Court speculates that few individuals given these circumstances would present themselves as optimistic at 4:00 a.m. Given this, it is a reasonable response that Deputy Schlegel would have found nothing unusual in Frank's demeanor. Deputy Schlegel served Frank breakfast and when he picked up the breakfast tray, he observed Frank holding a conversation on the telephone and observed that Frank did not appear angry or distressed. Thus, there is nothing in the record to indicate that Schlegel was aware of an imminent danger of suicide and deliberately or knowingly did nothing about it. Plaintiff attempts to argue that Schlegel's deposition demonstrates that Schlegel did not fully understand what Mr. Frank meant by stating he was "mental" and had sufficient factual information to determine that Mr. Frank suffered from a mental illness, was unstable, and presented as a suicide risk. However, plaintiff offers no evidence to support his conclusory statements. The evidence in the record reflects that Frank did not make any threats, cause any disturbances or do anything bizarre to lead Schlegel to believe that Mr. Frank might be a suicide risk. Under such circumstances, no reasonable factfinder could conclude that Officer Schlegel deliberately

ignored Mr. Frank's medical needs, was criminally reckless, or that he should have known Mr. Frank's behavior exhibited a strong likelihood of suicide.

Officer Gwyn Meyer helped escort Mr. Frank to his cell with Schlegel and Sauer. Construing the facts in a light most favorable to plaintiff, Meyer observed that Frank was very quiet and didn't respond to a question she asked him, she detected the odor of alcohol on him and she heard Officer Sauer mention that Frank had previously exhibited mood swings, which she assumed meant that he was violent or going to turn violent. Meyer stated that Frank looked like he was "different and strange," however, Meyer acknowledged that the correctional officers suspected that Frank might have been using marijuana prior to his arrest. Meyer was relieved at about 6:00 a.m. by Officer Thieme. Thus, Meyer's only contact with Frank was escorting him to his cell. Under these facts, no reasonable jury could conclude that Meyer should have known that Frank was an imminent risk of suicide especially when he was cooperative, did not appear despondent or depressed and did not cause a disturbance during the remainder of her shift.

As for Officer Thieme, plaintiff acknowledges that "plaintiff does not currently believe that defendant Thieme possessed the requisite knowledge and information to determine that Mr. Frank was a suicide risk, that would give rise to a cause of action against her." (Plaintiff's Response at 12.) Plaintiff agrees that Thieme cannot be held liable for the suicide of Mr. Frank. Thieme's contacts with Frank are tenuous: she did not book Frank or escort him to his cell, however, she did serve him breakfast. During her shift, Thieme did not observe anything about Frank which would suggest that he presented an imminent risk of suicide.

Therefore, the Court concludes that no reasonable factfinder could conclude that the defendants Schlegel, Meyer and Thieme were put on notice that there existed a strong likelihood or even possibility that Mr. Frank would commit suicide. Moreover, the Court notes that plaintiff was afforded the opportunity to depose all defendants (con-trary to the doctrine of qualified immunity), and has failed to present facts demonstrating deliberate indifference or criminal reckless-ness on the part of any of the correctional officers. Under the doctrine of qualified immunity, each defendant is shielded from lia-bility in this case.

Finally, even if the Court assumes that the behavior of the officers was violative of Mr. Frank's Fourteenth Amendment rights, no reasonable person in any of their shoes would have known that he or she was acting with deliberate indifference to Mr. Frank's serious medical needs. As previous-ly indicated, deliberate indifference only oc-curs when officials are aware of imminent danger and consciously or knowingly refuse to do anything about it, and does not include the negligent or inadvertent failure to pro-vide adequate medical care. As an initial matter, the Eleventh Circuit has noted that "[i]n the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation ... that has con-cluded that official conduct in failing to pre-vent suicide constitutes deliberate indiffer-ence." *Edwards v. Gilbert*, 867 F.2d 1271, 1274 (11th Cir.1989); *accord Hinkfuss v. Shawano County*, 772 F.Supp. 1104, 1114 (E.D.Wis.1991) (Curran, J.). In this case, Mr. Frank's behavior in the Dodge County jail did not suggest to the officers that he was an imminent danger to himself. Collec-tively, the officers observed Mr. Frank an-swer questions directly and clearly, walk to his cell without any problems, eat breakfast in the morning and engage in a conversation on the telephone.

Therefore, no reasonable jury could conclude that any of the correctional officers acted with deliberate indifference to Mr. Frank's apparent medical needs, or that they should have viewed Mr. Frank as a high suicidal risk. Nor would a reasonable person in their position have believed that Mr. Frank was in imminent danger, or that he or she was consciously or knowingly ignoring such risk through his or her conduct. Of course, with the benefit of hindsight, one can critique the actions of the officers and pro-pose other steps that could have been taken

to help prevent Mr. Frank's tragic suicide. Nonetheless, the doctrine of qualified immunity exists to protect public officials from exactly this degree of microscopic scrutiny. While inadvertence or negligence may render their actions imperfect, public officials may only be held legally responsible for knowingly and consciously violating the Constitution. Plaintiff's allegations against the Dodge County defendants fail to assert any facts constituting deliberate indifference to Frank's constitutional rights. Because no reasonable jury could conclude that the correctional officers in this case violated Mr. Frank's Fourteenth Amendment rights or possessed the requisite degree of intent, each enjoys qualified immunity from suit. As a result, Jeffrey Schlegel, Linda Thieme and Gwyn Meyer are dismissed as defendants in this action.

This Court's determination that the individual correctional officers did not violate Mr. Frank's constitutional rights necessarily renders moot the issue of whether policies of Dodge County are unconstitutional. The Supreme Court set forth the elements of a civil rights claim against a municipality in *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under *Monell,* a plaintiff must show (1) that he or she has suffered a deprivation of a constitutionally protected interest, and (2) that the deprivation was caused by an official policy, custom or usage of the municipality. *Id.* at 690–91, 98 S.Ct. at 2035–36. "If a person has suffered no constitutional injury at the hands of the individual police officer[s], the fact that the departmental regulations might have *authorized* the [policy in question] is quite beside the point." *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (emphasis in original); *see also Tom v. Voida,* 963 F.2d 952, 962 (7th Cir.1992). Municipality liability does not attach unless the policy in question actually results in a constitutional violation. *See City of Canton v. Harris,* 489 U.S. 378, 389–92, 109 S.Ct. 1197, 1205–07, (1989); *Hirsch v. Burke,* 40 F.3d 900, 904 (7th Cir.1994). Therefore, because the constitutional rights of Mr. Frank were not vio-

lated, the policies of Dodge County need not be reviewed for their constitutionality.

## IV. CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment filed by Dodge County and the Dodge County defendants is **GRANTED** and this case is **DISMISSED** in its entirety.

**SO ORDERED.**