940 F.2d 233
 Arturo SALAZAR, as Administrator of the Estate of Alejandro
Salazar, Deceased, Plaintiff-Appellant,
v.
CITY OF CHICAGO, a municipal corporation; Walter Wells,
Dennis Mangerich and Leo Marks, Police Officers of the City
of Chicago, Michael Nowacki and Edward Cinkues, Paramedics
of the Chicago Fire Department, Defendants-Appellees.
 No. 89-3551.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 23, 1990.
Decided Aug. 7, 1991.
 
 Donald T. Bertucci, Thomas A. Corfman, Andrew V. DePaul, argued, Berger & DePaul, Chicago, Ill., for plaintiff-appellant.
 Mardell Nereim, argued, Terence J. Moran, Kelly R. Welsh, Asst. Corp. Counsel, Office of the Corp. Counsel, Chicago, Ill., for defendants-appellees.
 Before WOOD, Jr., and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 MANION, Circuit Judge.
 
 
 1
 In the early morning hours of November 27, 1982, Alejandro Salazar made a fatal decision to drive his car after drinking excessively. At around 4:30 a.m., Salazar drove head-on into a parking meter, and then into the front wall of a Chicago restaurant. Salazar did not die instantly; rather, he died at around noon to 1:00 p.m. that day, several hours after police had taken him to the 19th District police station in Chicago and booked him for several traffic offenses.
 
 
 2
 Arturo Salazar, Alejandro's brother and the Administrator of Salazar's estate (and whom we shall refer to as the plaintiff), filed a lawsuit in federal court against the City of Chicago, Michael Nowacki and Edward Cinkues, paramedics who treated Salazar at the scene, Walter Wells, a police officer at the accident scene who arrested Salazar and ordered him taken to jail, and Leo Marks and Dennis Mangerich, the police lockup keepers at the 19th District station. The plaintiff sued all the defendants under 42 U.S.C. Sec. 1983, alleging that the defendants had deprived Salazar of his life without due process of law. The suit also alleged pendant state law claims against the defendants.
 
 
 3
 At the close of plaintiff's evidence, the district court directed a verdict for Wells, Marks, and Mangerich on the Sec. 1983 claims against them, and for the City on the plaintiff's claim that a policy or custom of the Chicago Police Department had deprived Salazar of his life without due process. After trial, the jury entered a verdict for paramedics Cinkues and Nowacki on the Sec. 1983 claims against them. The jury could not reach a verdict on the state law claims against any of the defendants. The jury also rendered no verdict on the plaintiff's claim against the City that a policy or custom of the Chicago Fire Department (which employed the paramedics) had deprived Salazar of his life without due process; despite the fact that he had not directed a verdict on that claim, the trial judge did not instruct the jury concerning that claim, and the verdict forms did not provide for a verdict for that claim. Since the plaintiffs did not object, we conclude the issue was waived.
 
 
 4
 The district court set a date for a new trial on the state law claims. The day before trial was to commence, the plaintiff moved to dismiss those claims without prejudice for lack of subject matter jurisdiction. The district court denied that motion. When the plaintiff's attorney told the court he would stand on his motion and not proceed to trial, the court dismissed the state law claims for want of prosecution.
 
 
 5
 The plaintiff has appealed the district court's judgment on all claims. The appeal raises several issues, the most significant of which are the proper standard of conduct to apply to the paramedics' and officers' actions to determine if those actions violated Salazar's due process rights, and the application of that standard to the facts of this case. The appeal also raises issues about the City's liability, and several evidentiary and instruction errors that the plaintiff argues require a new trial.
 
 I.
 
 6
 Shortly after Salazar ran his car into the restaurant, paramedics Nowacki and Cinkues arrived at the scene. Although they saw no outward sign of injury, it was obvious to them Salazar had been drinking. Nowacki took Salazar's vital signs, all of which were normal. Salazar's skin color and moisture also were normal, and the pupils of his eyes were responsive and equal. Nowacki began to examine Salazar by palpating Salazar's body. Salazar, however, stopped the examination and refused further service. When Nowacki and Cinkues asked Salazar if he wished to be taken to a hospital, Salazar responded, "no scene ... no hospital."
 
 
 7
 Sergeant George Head of the Chicago police arrived at the accident scene shortly after Nowacki and Cinkues. When Head arrived, he noticed extensive damage to the front end of Salazar's car. Salazar at that time was lying on the ground. Head did not hear Salazar answer any questions posed to him by Nowacki and Cinkues, and did not hear Salazar say anything to anybody. When Salazar rose to his feet and tried to walk, Head saw Salazar stagger eight to ten feet down the street, sit down on the curb, and fall over. After toppling over, Salazar righted himself. Head attributed Salazar's behavior to intoxication; in the rear seat of Salazar's car, Head had found a "balsa bag," a type of flask used in Mexico for drinking beverages. Head did not hear Salazar complain of any pain or injury, and saw no signs of injury. According to Head, Salazar "looked absolutely fine" except for his inebriation.
 
 
 8
 The Chicago police also dispatched Officer Wells to the accident scene. Wells arrived shortly after Head, while Head, Nowacki, and Cinkues were still at the scene. Wells noticed that Salazar appeared dazed, staggered when he tried to walk, and appeared to lose consciousness briefly. However, Wells could tell Salazar was intoxicated, and he attributed Salazar's actions to his intoxication. Wells noticed no visible sign of injury to Salazar, and one of the paramedics told Wells that Salazar had refused medical service. Salazar did not complain about any pain or injury, and did not ask to go to the hospital.
 
 
 9
 Thinking that Wells and the paramedics had the situation well in hand, Head left the scene. The paramedics left soon after, leaving Wells with Salazar. Wells decided to arrest Salazar and charge him with various traffic offenses, including driving under the influence of alcohol. When Wells told Salazar about the charges, Salazar, who was sitting on the curb, laid back on the sidewalk with his hands under the back of his head and smiled at Wells.
 
 
 10
 A squadrol soon arrived to take Salazar to the police station. The squadrol officers helped Salazar to his feet and escorted Salazar to the wagon. Salazar staggered while walking to the squadrol, but Wells attributed that to Salazar's inebriation.
 
 
 11
 The squadrol arrived at the police station at about 5:25 a.m. Salazar walked into the station under his own power, and asked to use the washroom. Wells said he could, and Salazar walked to the washroom unescorted. After Salazar returned from the washroom, he and Wells went to an interview room, where Wells completed paperwork concerning Salazar's case. Sometime during this process, Salazar vomited. Wells attributed this to Salazar's drunkenness. There was no blood in Salazar's vomit, something Wells would have interpreted as a sign of possible injury, and that would have led Wells to insist on taking Salazar to a hospital. Salazar also again asked to use the washroom, which he walked to under his own power. He then returned to the interview room. Wells finished his paperwork, and took Salazar to the lockup at around 6:30 a.m.
 
 
 12
 Marks and Mangerich were the lockup keepers at the station. Marks knew from Salazar's paperwork that Salazar had been in an automobile accident. He also knew Salazar was drunk. He did not, however, know Salazar had been injured. Mangerich did not even know Salazar had been in an automobile accident. He saw Salazar walking without assistance. Marks asked Wells about Salazar, and Wells told him that paramedics had treated Salazar at the scene and that Salazar had refused to go to a hospital.
 
 
 13
 Because Salazar was drunk, Marks and Mangerich placed Salazar in the cell closest to the front desk, a cell within their hearing if Salazar should call out. In the cell was a television camera which fed a picture to a monitor at Marks' and Mangerich's desk. The monitor was on continuously. Either Marks or Mangerich toured the lockup every fifteen minutes, and the watch commander and sergeant also inspected the lockup while Salazar was there.
 
 
 14
 During their inspections, Marks and Mangerich saw Salazar at various times walking back and forth in the cell and lying down in different parts of the cell. At times, he would lie down on one of the two cots (actually, two steel slabs protruding from the cell wall) in the cell, and at other times he would lie down on the cell floor. Salazar also appeared in various states of undress, at one point lying on the floor with his pants off and his underwear pulled down around his knees.
 
 
 15
 Neither Marks nor Mangerich knew Salazar was suffering from any injury until around noon, when Mangerich found Salazar lying on the floor motionless. Salazar was discolored and cool to the touch, and Mangerich could feel only a faint pulse. Marks and Mangerich called a fire department ambulance. The paramedics who arrived found Salazar in cardiac arrest. After performing various emergency procedures on Salazar, the paramedics took Salazar to Illinois Masonic Hospital, where he was pronounced dead at 2:52 p.m.
 
 
 16
 An autopsy revealed that Salazar died from a traumatic laceration of the liver caused by the automobile accident. According to a medical expert, a thin membrane, the consistency of Saran Wrap, surrounds the liver. When Salazar's liver was injured, it bled into the surrounding membrane, which did not tear at the time of the accident. The membrane stopped the bleeding for a while but after it ruptured the bleeding resumed and Salazar quickly bled to death.
 
 
 17
 Salazar's external signs of injury were "remarkably small." According to the autopsy, the only external signs were a small bruise over Salazar's sternum and some scrapes on his knees. One of the paramedics who treated Salazar at the lockup testified that he saw no signs of trauma on Salazar's body.
 
 II.
 
 18
 The plaintiff argues that by not taking Salazar to a hospital after his accident (a course of action that the jury could believe would likely have led to discovery and treatment of Salazar's ruptured liver) the paramedics (Nowacki and Cinkues) and police defendants (Wells, Marks, and Mangerich) deprived Salazar of his life without due process of law. Our first task is to determine the proper standard of conduct to apply to the defendants' actions.
 
 
 19
 An initial question arises as to whether Salazar was in custody, or, more precisely, free to leave and seek help on his own while the paramedics treated him. If so, the paramedics (and the City, at least based on the paramedics' conduct) cannot be liable for depriving Salazar of his life without due process. Government generally has no constitutional duty to provide rescue services to its citizens, and if it does provide such services, it has no constitutional duty to provide competent services to people not in its custody. DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); Archie v. City of Racine, 847 F.2d 1211, 1220-23 (7th Cir.1988) (en banc). The due process clauses of the Fifth and Fourteenth Amendments were designed to limit the government's power to act, to prevent government from abusing its power. DeShaney, 489 U.S. at 195, 109 S.Ct. at 1003. The clauses "forbid[ ] the state itself to deprive individuals of life, liberty, or property without 'due process of law,' but [their] language cannot fairly be extended to impose an affirmative obligation on the state to insure that those interests do not come to harm through other means." Id. "Amendments designed to protect the people from government, to cut it down to size lest it repeat the excesses of George III and the slave states, ... amendments phrased as prohibitions on governmental action rather than requirements of it, are not a plausible source of mandatory rescue services." Archie, 847 F.2d at 1221.
 
 
 20
 Although the state has no general constitutional duty to provide rescue services, the government may not cut off all sources of private aid or self-help, and then decline to provide replacement services. DeShaney, 489 U.S. at 199-200, 109 S.Ct. at 1005-06; Archie, 847 F.2d at 1221-23. If Salazar was in custody from the time the paramedics arrived--that is, if he was not free to seek other forms of assistance--then the paramedics might be liable for violating Salazar's right to due process by failing to treat his injuries. See DeShaney, 489 U.S. at 200, 109 S.Ct. at 1005-06; Archie, 847 F.2d at 1222; see also K.H. v. Morgan, 914 F.2d 846, 849 (7th Cir.1990) (state may not "deliberately and without justification place a criminal defendant in a jail or prison in which his health or safety would be endangered").
 
 
 21
 The paramedics have asserted in their brief that Salazar was not in their custody, and that he was (so far as they were concerned) free to seek out other sources of aid. The plaintiff naturally asserts otherwise. Although Wells did not formally arrest Salazar until after the paramedics left, it may be that Wells and Head would not have let Salazar go, and that the paramedics knew that Salazar was not free to leave. We need not explore this factual question, however, because at oral argument the paramedics' attorney conceded for purposes of this case that Salazar should be treated as a pretrial detainee in determining the proper standard to apply both to the paramedic and police defendants. Because it will not affect the case's outcome, we accept this concession.
 
 
 22
 This brings us to the question of what standard governs the paramedics' and police officers' conduct. In other words, what duty does the Constitution impose on state officials to provide medical care for pretrial detainees? The district court decided that the paramedics and police officers could be liable only if they were "deliberately indifferent" to Salazar's medical needs. The court defined deliberate indifference in its jury instructions in the paramedics' case as follows:
 
 
 23
 To establish that the defendants' failure to provide medical care for Alejandro Salazar was sufficiently blameworthy to violate constitutional guarantees ... plaintiff must prove ... that the defendants had actual knowledge that there was a substantial risk that Alejandro Salazar might die or suffer grievous harm if additional medical services were not provided and that the defendants, despite such knowledge, deliberately imposed such a risk on Mr. Salazar.
 
 
 24
 [Tr. 797.] (The court also applied the deliberate indifference standard in deciding to grant a directed verdict for the police officer defendants and for the City for claims based on police department policies.)
 
 
 25
 The plaintiff argues that grossly negligent conduct may violate the due process clause, noting that the Supreme Court has expressly declined to decide whether the due process clause prohibits grossly negligent conduct. See Daniels v. Williams, 474 U.S. 327, 334 n. 3, 106 S.Ct. 662, 666 n. 3, 88 L.Ed.2d 662 (1986). This court, however, flatly rejected this argument in Archie. See 847 F.2d at 1219-20. We held in Archie that neither negligence nor even gross negligence is a sufficient basis for liability. Id. at 847 F.2d at 1218-19. We based this holding on the Supreme Court's holding in Daniels, 474 U.S. 327, 106 S.Ct. 662, and Davidson v. Cannon, 474 U.S. 344, 347-48, 106 S.Ct. 668, 670-71, 88 L.Ed.2d 677 (1986), that negligent conduct does not implicate the due process clause. If negligence does not violate due process, neither does gross negligence. The line between negligence and gross negligence is so indistinct that it cannot be policed, and "a line that cannot be policed is not a line worth drawing in constitutional law." Archie, 847 F.2d at 1219. Moreover, the line is not worth drawing in any event because the distinction between negligence and gross negligence does not respond to the due process clause's function, which is to control abuses of government power. A "gross" error is still only an error, and an error is not an abuse of power. Since an error by a government official is not unconstitutional, "it follows that 'gross negligence' is not a sufficient basis for liability." Id. at 1220.
 
 
 26
 If gross negligence is not a sufficient basis for constitutional liability, what is? In Archie, we held that only intentional or reckless conduct violates the due process clause. Archie, 847 F.2d at 1218-19. By reckless conduct we mean conduct that is reckless in the criminal sense; that is, conduct "that reflects complete indifference to risk--when the actor does not care whether the other person lives or dies, despite knowing that there is a significant risk of death." Archie, 847 F.2d at 1219; see also Ross v. United States, 910 F.2d 1422, 1433 (7th Cir.1990) ("For recklessness in the constitutional sense, the state actor must ignore a known and significant risk of death"). Duckworth v. Franzen, 780 F.2d 645, 652 (7th Cir.1985) (criminal recklessness "implies an act so dangerous that the defendant's knowledge of the risk can be inferred"). In Duckworth, the question facing this court was how to define "deliberate indifference"; we decided that deliberate indifference means intentional or criminally reckless conduct. See Duckworth, 780 F.2d at 652-53. Since only intentional or criminally reckless conduct implicates the due process clause, and since "deliberate indifference" (in this circuit) is merely a synonym for intentional or criminally reckless conduct, it follows that the paramedics and police officers deprived Salazar of his life without due process only if they were deliberately indifferent to his medical needs. Put another way, the paramedics and police officers deprived Salazar of his life without due process only if they intended for him to die or suffer grievously (something even the plaintiff does not contend) or if they knew of a significant risk that Salazar would die or suffer grievously but were indifferent to that risk.
 
 
 27
 It is true that Archie involved the state's duty to a member of the public-at-large, and that Archie distinguished between the state's duty to provide medical care to its citizens at large, and its duty to those, such as pretrial detainees, to whom it has cut off sources of self help. See Archie, 847 F.2d at 1221-23. But Archie does not say that the state violates the due process clause by inadvertently, negligently, or even grossly negligently failing to provide services for those people under the state's custody or control. The constitutional standard of care to persons whom the state has taken into custody is analogous to the common law standard of care toward such people. At common law, a person who "takes the custody of another" so as to deprive that person of "normal avenues of protection" has a duty to "protect [that person] against unreasonable risk of physical harm" and to "give [that person] first aid after it knows or has reason to know [that person is] ill or injured." Id. at 1222; Restatement (2d) of Torts Sec. 314A(4). Similarly, one who "takes charge of another who is helpless adequately to aid or protect himself" must exercise "reasonable care" to secure that person's safety and not discontinue his aid if to do so would leave that person "in a worse position than when the actor took charge of him." Archie, 847 F.2d at 1222; Restatement (2d) of Torts Sec. 324. Archie, however, characterizes the constitutional rule as just "a shadow of the common law of torts, changing only the mental states on the rationale of Daniels "--a rationale that Archie had earlier relied on in holding that only intentional or criminally reckless conduct violates the due process clause. Archie, 847 F.2d at 1222; see id. at 1218-20. Archie 's characterization of the constitutional standard of care towards those in state custody coupled with its explicit holding that only intentional or criminally reckless conduct violates the due process clause, leaves little room for doubt that the deliberate indifference standard applies to pretrial detainees.
 
 
 28
 There is still another reason why deliberate indifference is the proper standard of conduct in the case of a pretrial detainee. When determining whether a state actor has violated a pretrial detainee's right to due process, "the proper inquiry is whether [the act at issue] amount[s] to punishment of the detainee." Bell v. Wolfish, 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979); see also Anderson v. Gutschenritter, 836 F.2d 346, 348 (7th Cir.1988) ("Due process protects the rights of a pretrial detainee not to be punished"); Titran v. Ackman, 893 F.2d 145, 147 (7th Cir.1990). The state has a right to hold a pretrial detainee in custody. But the state may not actually punish that person "prior to an adjudication of guilt in accordance with due process of law." Bell, 441 U.S. at 535, 99 S.Ct. at 1872. Punishment, in its normal meaning, implies intent; it is "a deliberate act intended to chastise or deter." Duckworth, 780 F.2d at 652. For a jail guard deliberately to beat a pretrial detainee would be "punishment"; for the guard negligently to step on the detainee's toe and break it would not be punishment "in anything remotely like the accepted meaning of the word." Id. It follows that an act done with any state of mind less than intent, no matter how "gross" that state of mind, is not punishment. Criminal recklessness is a proxy for intent. Archie, 847 F.2d at 1220. Any state of mind short of criminal recklessness "does not import danger so great that knowledge of the danger [and thus, intent to inflict it] can be inferred...." Duckworth, 780 F.2d at 653. Since the due process clause prohibits punishing a pretrial detainee before a formal adjudication of guilt, and since only intentional or criminally reckless conduct can amount to punishment, only intentional or criminally reckless conduct in the medical treatment of a pretrial detainee--that is, deliberate indifference to the detainee's serious medical need--violates due process.
 
 
 29
 By this discussion of Duckworth, we do not mean to imply that the Eighth Amendment governs the standard of conduct of a jailer toward a pretrial detainee. It does not because the Eighth Amendment prohibits only cruel and unusual punishments while the Fourteenth Amendment does not allow jailers to punish pretrial detainees at all, no matter how humane or common the punishment might be. But since both amendments prohibit punishment to a certain degree, a necessary question to answer to determine whether a particular act violates a pretrial detainee's right to be free from punishment or a convicted prisoner's right to be free from cruel or unusual punishment is, "Is the act punishment?" Duckworth tells us that to be punishment an act must be intentional or criminally reckless. Punishment is punishment, and there is no reason why the term should mean two different things in the Eighth and Fourteenth Amendment contexts. So, Duckworth 's definition of punishment is just as relevant in the Fourteenth Amendment context as it is in the Eighth Amendment context.
 
 
 30
 Despite this court's reasoning in Archie and Duckworth, the plaintiff maintains that this circuit has expressly ruled that deliberate indifference is not the proper standard to apply to actions toward pretrial detainees. He cites two cases for this proposition. In Matzker v. Herr, 748 F.2d 1142, 1146 (7th Cir.1984), we stated that a pretrial detainee complaining about inadequate medical treatment "does not have to demonstrate that the [jailer's] acts were deliberately indifferent...." However, Matzker predated both Duckworth (which explained the relationship between punishment and intent) and Archie (which expressly held that only intentional or criminally reckless conduct violates the due process clause). At least one more recent case has applied expressly the deliberate indifference standard to a pretrial detainee's claim of inadequate medical treatment. See Martin v. Tyson, 845 F.2d 1451, 1457-58 (7th Cir.1988). Matzker 's implication that something less than intentional or reckless conduct violates due process does not survive these cases. In any event, Matzker is at least factually consistent with our decision. In Matzker, the plaintiff had allegedly suffered a broken nose, three broken teeth, and an injured eye in an attack by other inmates. Matzker told jail authorities about his injuries, but they did not bother to treat those injuries for three months. 748 F.2d at 1147. Thus, in Matzker, the jail authorities knew that Matzker had sustained serious injuries, yet ignored those injuries. Even under a deliberate indifference standard, Matzker stated a due process claim.
 
 
 31
 Matzker 's refusal to apply a deliberate indifference standard was based on our decision in Kincaid v. Rusk, 670 F.2d 737 (7th Cir.1982), the second case plaintiff cites. In Kincaid, we stated that the Eighth Amendment standard announced in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (that is, deliberate indifference) "is not directly relevant to the due process standard applicable to pretrial detainees as enunciated in Wolfish." Id. at 743-44 n. 8. Like Matzker, however, Kincaid predates Duckworth, Archie, and Tyson, and its implicit rejection of the deliberate indifference standard does not survive those cases. Moreover, Kincaid involved a prison policy of restricting certain reading material. The issue in Kincaid was not whether the defendants intended to deprive the inmates of reading material; instead, the issue was whether this unquestionably intentional conduct was itself intended as punishment (since not all restrictions on pretrial detainees amount to punishment, see Bell, 441 U.S. at 536-40, 99 S.Ct. at 1872-75). See Kincaid, 670 F.2d at 742-43. Therefore, Kincaid is not inconsistent with a constitutional standard that makes only intentional or reckless conduct actionable.
 
 
 32
 In any event, a case we decided after Duckworth but before Archie harmonizes Matzker with our holding today. In Anderson v. Gutschenritter, supra, a pretrial detainee who had been attacked by his cellmate sued the supervising sheriff. The district court directed a verdict for the sheriff. This court reversed, holding that the evidence was sufficient for the jury to find that the sheriff "had shown indifference or a willingness to allow the attack...." 836 F.2d at 349. In Anderson, the jury could have found that the sheriff had personally threatened the plaintiff, knew of threats and rumors of threats to kill the plaintiff, and had himself stirred up resentment against the plaintiff. Id. at 347-48, 349. Despite all this, the sheriff did nothing to protect the plaintiff against attacks by other inmates.
 
 
 33
 In discussing the proper legal standard to apply to the plaintiff's claim in Anderson, we stated that the plaintiff had to prove that the sheriff "acted deliberately or with callous indifference." Id. at 349. We find this verbal formulation difficult to distinguish from the deliberate indifference standard we have adopted in this case. More importantly, in Anderson the facts--particularly the fact that the sheriff was himself "stirring up trouble"--were sufficient to show that he failed to protect the plaintiff despite knowledge of a substantial risk to the plaintiff's safety. Anderson is not inconsistent with our holding today, either factually or in the verbal formulation of the standard it adopted, and its treatment of Matzker makes it unnecessary for us to formally overrule that case.
 
 
 34
 Having determined that it was correct to apply the deliberate indifference standard to the paramedics' and police officers' conduct, we must apply that standard to the facts in this case. The district court directed a verdict for Wells, Marks, and Mangerich (the police officers), holding that no reasonable jury could find that the officers were deliberately indifferent to Salazar's medical needs. We agree. There was no evidence that any of the officers knew Salazar faced a serious risk of death or other grievous harm absent further medical attention. None of the officers saw any sign of injury on Salazar, and the evidence demonstrated that Salazar displayed no obvious external signs of injury and never complained about any pain or injury. Wells knew Salazar had been in a serious traffic accident, but he also knew that paramedics had treated Salazar and that he had refused further treatment. Marks also knew about Salazar's accident, the paramedics' treatment, and Salazar's refusal of further treatment, since Wells had told him about these things. There was no evidence that Mangerich even knew Salazar had been involved in an accident.
 
 
 35
 All three officers saw Salazar walk under his own power. It is true that Salazar was staggering, and that he vomited at the police station. However, Salazar was drunk, and the officers knew he was drunk. Salazar's behavior was consistent with drunkenness. Perhaps it was negligent to lock somebody as inebriated as Salazar was in a jail cell, but absent any indication of other serious injury, it was not criminally reckless, especially considering that Marks and Mangerich put Salazar in a cell from which they could hear him if he requested help, and kept an eye on Salazar while he was locked up.
 
 
 36
 The plaintiff argues that Marks and Mangerich should have noted Salazar's unusual behavior after he was locked up--for example, his shifting positions in the cell, his various states of undress, and his preference for lying on the floor rather than a cot--and taken that behavior as a sign of injury. Perhaps, but we cannot say that Marks' and Mangerich's failure to equate Salazar's behavior with serious injury reflected a "complete indifference to risk," Archie, 847 F.2d at 1219, of serious injury or death. Drunks do odd things, and it was not reckless to attribute Salazar's behavior to his inebriation. As for lying on the floor rather than a cot, the "cots" were nothing more than bare steel slabs. A preference for a concrete floor over bare steel does not indicate serious internal injury. Marks and Mangerich did monitor Salazar, and immediately sought medical attention for him when they realized he needed it. The district court properly directed a verdict for Marks and Mangerich, as well as for Wells, who did not observe Salazar's unusual behavior in his cell.
 
 
 37
 The case against paramedics Nowacki and Cinkues went to the jury, and the jury found they were not liable. The evidence amply supports this verdict. In fact, we think the evidence was such that this was the only conclusion a reasonable jury could have reached. Nowacki and Cinkues did not see any obvious sign of injury on Salazar. It is true that paramedics are trained to look beyond the obvious. But Nowacki and Cinkues did begin to examine Salazar. This examination revealed that Salazar's vital signs were all normal, that his skin color and skin moisture were normal, and that the pupils of his eyes were responsive and equal. Salazar did not complain about any pain or injury, and he refused further treatment. Perhaps Nowacki and Cinkues should have done more for Salazar, and perhaps their failure to do more was either negligent or (doubtedly) grossly negligent. But Nowacki's and Cinkues' actions do not evidence the complete indifference to Salazar's well-being that constitutes deliberate indifference.
 
 
 38
 The plaintiff focuses on Salazar's refusal of treatment, arguing that Nowacki and Cinkues should not have accepted his refusal because Salazar was drunk and therefore incompetent. In retrospect, it would have been wiser to take Salazar to a hospital to check for internal injuries. But it was not criminally reckless not to do so. The testimony concerning Salazar's condition was consistent: he appeared fine, except for his intoxication. What the plaintiff is arguing for is mandatory transportation to a hospital for all intoxicated accident victims, regardless of whether they appear to be injured, and regardless of their consent or lack of consent. This is something the Constitution does not require. Since the evidence in this case was insufficient to support a verdict that Nowacki and Cinkues were deliberately indifferent to Salazar's serious medical needs, we affirm the jury's verdict for Nowacki and Cinkues.[1]
 
 III.
 
 39
 The plaintiff raises several other issues. The plaintiff challenges the judgment against him on his claim against the City based on the fire department's alleged policy of allowing paramedics to decide whether or not to transport incompetent people to hospitals. The plaintiff argues that the district court improperly excluded evidence that he sought to introduce to support this claim. However, we will not consider this argument because the plaintiff waived this claim in the district court by not objecting when the district court failed to instruct the jury on this claim.
 
 
 40
 At the close of the plaintiff's case, the defendants moved for directed verdict on all counts. The district court granted the motion in part, but the court expressly denied the City's motion for directed verdict on the claim based on the fire department's policies. At the close of trial, both the plaintiff and the City proffered instructions relating to this claim. The court, however, refused all the plaintiff's instructions, and the City withdrew its proposed instructions. Thus, the court never instructed the jury on this issue, so the jury had no opportunity to decide it.
 
 
 41
 The plaintiff contends he has not waived his claim concerning the fire department's policies because he did submit instructions on the issue. But the record shows the plaintiff did not object either when the court refused those instructions, or when the court failed to instruct the jury at all on the issue. Submitting instructions is not sufficient to preserve an error in failing to give those instructions; the party who wants the instruction given must object to the refusal to give the instruction. Fed.R.Civ.P. 51; see Sims v. Mulcahy, 902 F.2d 524, 534-35 (7th Cir.1990). Cf. Varhol v. National Railroad Passenger Corp., 909 F.2d 1557, 1567-68 (7th Cir.1990) (per curiam) (failure to request limiting instruction when evidence was introduced waived argument that district court erred in not giving a limiting instruction, despite the fact that the party asked the court several times beforehand to give such an instruction). Since the plaintiff did not object when the district court failed to present his fire department policy claim to the jury, he has waived that claim on appeal.
 
 
 42
 The plaintiff also asserts that the district court erred in directing a verdict for the City on his claim based on the police department's alleged policy of letting police officers untrained in medicine decide whether to seek treatment for mentally impaired accident victims. The plaintiff, however, offers no argument on this point other than stating the point, and has cited no legal authority to support his assertion. Therefore, he has waived this argument for appeal. See Holzman v. Jaymar-Ruby, Inc., 916 F.2d 1298, 1303 (7th Cir.1990); Reynolds v. East Dyer Development Co., 882 F.2d 1249, 1253 n. 2 (7th Cir.1989).
 
 
 43
 Finally, the plaintiff argues that the district court erred by dismissing his state law claims for failure to prosecute rather than dismissing the claims without prejudice for lack of jurisdiction. The district court had jurisdiction over the state law claims under the doctrine of pendent jurisdiction.[2] Where, as here, the federal and state law claims have already been tried, and a state claim remains for retrial, the district court in its discretion may decide to retain jurisdiction over the state law claim. See Cenco, Inc. v. Seidman & Seidman, 686 F.2d 449, 458-59 (7th Cir.1982). In this case, judicial economy supported retaining jurisdiction over the plaintiff's state law claims. The claims had already been tried once, discovery had been done, and the district court judge was familiar with the case and the disputes that would likely arise at trial. It would have made little sense to make the parties start the case over in a new court before a new judge who would have to learn the case from scratch. The plaintiff has offered no reasons for relinquishing jurisdiction here. Consequently, the plaintiff has not shown the district court abused its discretion in exercising jurisdiction. Since it was proper to retry the state law claims in the district court, and since the plaintiff's attorney announced that he would not try the case, the district court properly dismissed the state law claims for failure to prosecute under Fed.R.Civ.P. 41(b).
 
 
 44
 For the above reasons, we affirm the district court's judgment.
 
 
 45
 AFFIRMED.
 
 
 
 [1]
 Our resolution of this issue makes it unnecessary for us to address the plaintiff's argument that the district court improperly instructed the jury on whether Nowacki and Cinkues acted under color of law. Since the evidence was insufficient to support a verdict for the plaintiff, even on the assumption that defendants were acting under the color of law, the allegedly erroneous instruction makes no difference to the outcome
 
 
 [2]
 Congress has since codified the doctrine of pendent jurisdiction under the name "Supplemental Jurisdiction." See 28 U.S.C. Sec. 1367