**Alexius CORNELIA, Plaintiff,**

v.

**Richard LAIB, individually and in his official capacity, John Petrocelli and Dr. Rodrigo Floro, all individually and Correctional Medical Services of Illinois, Inc. and several unnamed and unknown persons employed by the Will County Sheriff's Department, Defendants.**

No. 99 C 1500.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 13, 2000.

. Edward M. Fox, Garrett Browne, Ed Fox. & Associates, Chicago, IL, for Plaintiff.

Gerald Haberkorn, Deborah Rusoff O'Brien, Robert Hill Smeltzer, Michael J. Sturino, Lewis & Gellen, Chicago, IL, for Richard Laib.

Robert P. Vogt, Stacy, Dolan, Fulco, Weldon–Linne & Vogt, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

LEVIN, United States Magistrate Judge.

Plaintiff Alexius Cornelia ("Plaintiff") filed a three count Fourth Amended Complaint against Defendants Nurse John Petrocelli ("Nurse Petrocelli") and Dr. Rodrigo Floro ("Dr.Floro"). Count II alleges a civil rights violation pursuant to 42 U.S.C. § 1983 (" § 1983"). Specifically, Plaintiff alleges via Count II that Nurse Petrocelli and Dr. Floro violated his constitutional rights when they were deliberately indifferent to Plaintiff's serious medical needs when he was arrested and detained at Will County Adult Detention Facility (the "Jail"). Defendants now move for summary judgment as to Count II. For the reasons set forth below, the court grants Defendants' motion for summary judgment.

### BACKGROUND

Plaintiff is an insulin-dependent diabetic. (Defs.' 56.1(a) Statement ¶ 7.) On Decem-

ber 5, 1998, a little after midnight, the Plaintiff was arrested and brought to the Jail where he was held for approximately twelve hours. (*Id.* at ¶¶ 1, 6.) Nurse Petrocelli, a Correctional Medical Services ("CMS") nurse, who worked the night shift at the Jail from 11:00 p.m. to 7:00 a.m., first saw Plaintiff at 12:40 a.m. on December 5, 1998. (*Id.* at ¶ 20.) The Plaintiff told Nurse Petrocelli that he was an insulin-dependent diabetic and that he was taking Humulin 70/30 insulin—18 units in the morning and 25 units in the afternoon (*Id.* at ¶ 21.) Plaintiff also informed Nurse Petrocelli that he obtained his prescriptions from the K–Mart Pharmacy ("Pharmacy"). (*Id.*)

Nurse Petrocelli took Plaintiff's medical history, checked his vital signs and obtained a blood sugar level reading. (*Id.* at ¶ 22.) The Plaintiff's blood sugar level was 374; however, he did not have any signs or symptoms of hyperglycemia (high blood sugar). (*Id.* at ¶¶ 22, 23.) All of the Plaintiff's vital signs were normal and the Plaintiff did not have any complaints. (*Id.* at ¶ 22.) Defendant stated that he felt very tired at that time, but he was not then suffering any other symptoms. (Cornelia Dep. at 89.)

Because Plaintiff's blood sugar level indicated that his diabetes was poorly controlled, Nurse Petrocelli needed to verify the type and dose of Plaintiff's prescription information as soon as possible so that he could get Plaintiff back on his normal insulin regime. (Defs.' 56.1(a) Statement ¶ 23.) Nurse Petrocelli had no way of knowing when the Plaintiff last took his medication or if the Plaintiff had any dietary concerns. (*Id.*) In addition, Nurse Petrocelli was unable to verify when the Plaintiff last ate or to contact Plaintiff's doctor to verify his insulin regime. (*Id.*)

Nurse Petrocelli immediately requested that Plaintiff arrange to have someone bring his medication to the Jail because the Pharmacy would not open until 9:00 a.m. (*Id.* at ¶ 24.) Plaintiff contacted his mother and she agreed to bring his medication to the Jail. (*Id.*) Nurse Petrocelli made a notation on Plaintiff's medical chart that he intended to contact Dr. Floro, the Jail's Medical Director, for orders unless the Plaintiff exhibited signs or symptoms of hyperglycemia. (*Id.* at ¶ 25.) If Nurse Petrocelli found that the Plaintiff exhibited signs and symptoms of hyperglycemia then he would send the Plaintiff directly to the hospital. (*Id.*) Nurse Petrocelli told Plaintiff that he was going to verify Plaintiff's prescription and check with the doctor regarding his treatment. (*Id.*)

At about 5:45 a.m., on December 5, 1998, Nurse Cindy Boston ("Nurse Boston"), another CMS nurse who worked the night shift with Nurse Petrocelli, assessed the Plaintiff. (*Id.* at ¶¶ 32, 39.) Nurse Boston took another blood sugar level reading of the Plaintiff and found that his blood sugar level was 361. (*Id.* at ¶ 39.) This reading was 13 points lower than the previous reading taken by Nurse Petrocelli at 12:40 a.m. (*Id.*) Furthermore, Nurse Boston testified, and the medical record discloses, the Plaintiff was not exhibiting any signs or symptoms associated with hyperglycemia and he did not complain that he was not feeling well. (*Id.*) Plaintiff testified that by that time he was feeling quite sick and was well out of it. (Cornelia Dep. at 97–99.)

At about 5:45 a.m. Dr. Floro was paged by Nurse Petrocelli. (Defs.' Ex. G, Medical Chart; Petrocelli Dep. at 62–63; Wright Dep. at 131.) At approximately 6:45 a.m., Nurse Petrocelli received a return phone call from Dr. Floro. (Defs.' 56.1(a) Statement ¶ 27.) Nurse Petrocelli informed Dr. Floro of the Plaintiff's blood sugar level readings, that the Plaintiff was in stable condition and that he was not exhibiting any signs or symptoms of hyperglycemia. (*Id.* at ¶¶ 64, 65.) Dr. Floro ordered the nursing staff to verify the Plaintiff's insulin dosage and to observe him in case he started to exhibit signs or

symptoms of hyperglycemia. (*Id.* at ¶ 65.) Dr. Floro also told Nurse Petrocelli that if the Plaintiff's condition deteriorated or if he exhibited any symptoms then he should be transferred to the hospital. (*Id.*) Nurse Petrocelli passed on Dr. Floro's orders to the morning nursing staff because his shift ended at 7:00 a.m. (*Id.* at ¶ 27.)

At 10:30 a.m., Nurse Audra Kutz ("Nurse Kutz"), who worked the day shift from 7:00 a.m. to 11:00 p.m., assessed the Plaintiff. (*Id.* at ¶ 44.) The Plaintiff told Nurse Kutz that he was an insulin-dependent diabetic and about his insulin routine. (*Id.*) Nurse Kutz asked the Plaintiff what medication he was taking and called the Pharmacy to verify the Plaintiff's prescription. (*Id.*) The Pharmacy verified a prescription for the Plaintiff that was different than the one the Plaintiff had given Nurse Petrocelli and Nurse Kutz. (*Id.*) Nurse Kutz also understood that Plaintiff's mother was bringing his prescription to the Jail so that it could be verified. (*Id.* at ¶ 46.) The Plaintiff was still not exhibiting any signs or symptoms of hyperglycemia. (*Id.*)

At 11:20 a.m., Nurse Kutz checked on the Plaintiff and took another blood sugar level reading. (*Id.* at ¶ 48.) Plaintiff's blood sugar level had risen to 463 which was a 100 point increase from Nurse Boston's 5:45 a.m. reading. (*Id.*) Nurse Kutz noted that the Plaintiff was alert and oriented to person, place and time and that he did not exhibit any signs or symptoms of hyperglycemia. (*Id.* at ¶ 49.) Nurse Kutz then paged Dr. Floro for orders. (*Id.* at ¶ 48.) Because she did not receive a return call from Dr. Floro, Nurse Kutz paged Dr. Roberto Limon ("Dr. Limon") another one of the Jail's physicians. (*Id.* at ¶ 49.)

At 11:40 a.m., Dr. Limon returned Nurse Kutz's page. (*Id.* at ¶ 50.) At this time, the Plaintiff complained of feeling dizzy, but he remained alert and coherent. (*Id.*) He was not exhibiting diaphoresis (profuse sweating) or any type of respiratory distress. (*Id.*) Because Nurse Kutz had verified Plaintiff's medication, Dr. Li-

mon ordered Nurse Kutz to administer 10 units of R insulin to the Plaintiff. (*Id.* at ¶ 51.) Five minutes later, at 11:45 a.m., Dr. Limon ordered Nurse Kutz to administer another 20 units of N insulin to the Plaintiff. (*Id.*)

The Plaintiff continued to remain alert, but 15 minutes later at 12:00 p.m., the Plaintiff complained of chest pain and shortness of breath. (*Id.* at ¶ 53.) Nurse Kutz observed that the Plaintiff was incoherent at this time. (*Id.* at ¶ 52.) The Plaintiff had been given 30 units of insulin, but his blood sugar level had still risen to 496 and his vital signs were elevated. (*Id.* at ¶ 53.) Nurse Kutz called Dr. Limon and described his signs and symptoms. (*Id.* at ¶ 54.) Dr. Limon ordered that the Plaintiff be transferred to the hospital. (*Id.*)

At 12:25 p.m., an ambulance took the Plaintiff to St. Joseph's Hospital ("Hospital"). (*Id.* at ¶ 68.) At the Hospital, a history and physical were performed by the emergency room physician. (*Id.*) The physician found that the Plaintiff's vital signs were normal and that he was alert, awake, and oriented. (*Id.*) All other aspects of the Plaintiff's physical examination were normal. (*Id.*) The Plaintiff denied shortness of breath, chest pain, palpatations, nausea and vomiting. (*Id.*) He also denied tingling, abdominal pain and urinary symptoms. (*Id.*) However, because the Plaintiff's blood sugar level was continuing to rise he was admitted to the Hospital. (*Id.*)

While Plaintiff was in the Hospital, he was placed on an insulin drip and his blood sugar level was taken every hour. (*Id.* at ¶ 69.) The Plaintiff's blood sugar level was measured 45 times and it was within normal limits on only two occasions. (*Id.*) During the hospitalization, Plaintiff's blood sugar levels were as high as 308, 320, 333 and 361 despite the fact that Plaintiff underwent intensive insulin therapy. (*Id.*)

On December 6, 1998, the Plaintiff's blood sugar level returned to normal. (*Id.*)

The Plaintiff has no residual injuries as a result of his stay at the Jail and the hospital. (*Id.* at ¶ 71.) No physician has ever stated that the Plaintiff suffered an injury as a result of being detained at the Jail or subsequent hospitalization. (*Id.*) Furthermore, the Plaintiff does not take any new or different medication as a result of being detained at the Jail or subsequent hospitalization. (*Id.*)

## LEGAL STANDARDS

### I. Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party had produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial. *LINC Fin. Corp. v. Onwuteaka,* 129 F.3d 917, 920 (7th Cir.1997).

In deciding a motion for summary judgment, a court must "review the record in the light most favorable to the nonmoving party and to draw all reasonable inferences in that party's favor." *Vanasco v. National–Louis Univ.,* 137 F.3d 962, 964 (7th Cir.1998). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the nonmovant may not rest upon mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also LINC,* 129 F.3d at 920. A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson,*

477 U.S. at 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505, 91 L.Ed.2d 202.

### II. Deliberate Indifference

■ The Supreme Court has ruled that under the Eighth Amendment, a prison official may be held liable for acting with deliberate indifference to inmate health or safety if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The court in *Farmer* clarified the standard for deliberate indifference in the prison context through the application of a two part test. 511 U.S. at 834, 114 S.Ct. 1970, 128 L.Ed.2d 811. First, the danger to the inmate must be objectively sufficiently serious, posing substantial risk of serious harm. *Id.* Second, the prison official must have a sufficiently culpable state of mind-one of deliberate indifference to inmate health or safety. *Id.* The Court then went on to state:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he also must draw the inference.

511 U.S. at 827, 114 S.Ct. 1970, 128 L.Ed.2d 811.

The Court further held that "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our

cases be condemned as the infliction of punishment." 511 U.S. at 838, 114 S.Ct. 1970, 128 L.Ed.2d 811.

For a plaintiff to bring a cognizable § 1983 claim under the Eighth Amendment for medical mistreatment or denial of medical care, then, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The indifference to medical needs must be substantial; inadequate treatment due to negligence, inadvertence or differences in judgment between an inmate and medical personnel do not rise to the level of constitutional violations. *Estelle*, 429 U.S. at 105–07, 97 S.Ct. 285, 50 L.Ed.2d 251; *Hughes v. Joliet Correctional Center*, 931 F.2d 425, 428 (7th Cir.1991). The standard of deliberate indifference may be met by either demonstrating intentional or criminally reckless conduct on the part of the defendants. *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir.1991).

 "A plaintiff can show that the professional disregarded [a serious medical need] only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir.1998). Evidence that some medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim. *Id.* relying on *Steele v. Choi*, 82 F.3d 175, 179 (7th Cir.1996). A disagreement about which of many professionally acceptable treatment plans should have been implemented might state a negligence cause of action, but is not actionable under the Constitution. *Id.* at 990.

 In the instant case, the Plaintiff was a pretrial detainee. The Due Process Clause prohibits deliberate indifference to the medical needs of a pretrial detainee. *Chavez v. Cady*, 207 F.3d 901, 904–05 (7th Cir.2000); *Salazar*, 940 F.2d at 237–38. The due process rights of a pretrial detain-

ee are at least as great as the Eighth Amendment protection available to a convicted prisoner. *Hall v. Ryan*, 957 F.2d 402, 405–06 (7th Cir.1992), *citing Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244–45, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Salazar*, 940 F.2d at 241 (deliberate indifference standard applies to pretrial detainee.) Generally, a due process claim alleging inadequate medical care is analyzed the same way as a claim under the Eighth Amendment to determine whether officials showed deliberate indifference to serious medical needs. *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). As in the case of a confined prisoner, deliberate indifference will be found only where the defendant knows of, and disregards, an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970, 128 L.Ed.2d 811. The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and the defendant must actually draw that inference. *Id.*

## ANALYSIS

Plaintiff's threshold argument in Count II of his Fourth Amended Complaint is that Defendants Nurse Petrocelli and Dr. Floro violated his constitutional rights when they were deliberately indifferent to his serious medical needs when he was arrested and detained at the Jail on December 5, 1998. Plaintiff alleges that the Defendants knew that he had a dangerously high blood sugar level and required insulin during his period of detention. But despite this knowledge, the Defendants ignored the Plaintiff and stood by while he went into ketoacidosis and became gravely ill and needed to be hospitalized. (Pl.'s Mem. at 8.)

### I. Nurse Petrocelli Is Entitled To Summary Judgment

#### A. Plaintiff's Blood Sugar Level

 The Plaintiff first contends that Nurse Petrocelli failed to act despite his

knowledge that Plaintiff's blood sugar levels were dangerously high. (Pl.'s Mem. at 8.) The Plaintiff alleges that Nurse Petrocelli was deliberately indifferent to his medical needs because he knew that Plaintiff's blood sugar levels had reached as high as 361 and 374. (*Id.*)

In this case, however, the medical personnel involved agreed and testified that every patient is different regarding when a patient's blood sugar level is considered to be "dangerously high." The Plaintiff's own expert, Dr. Lester Wright, testified that a blood sugar level that may be dangerous for one person may not be dangerous for another. (Wright Dep. at. 73.) Additionally, Dr. Floro and Dr. Wright both testified that a blood sugar level is dangerously high when a patient begins to exhibit signs and symptoms of hyperglycemia. On this point, it is undisputed and the records clearly reflect that the Plaintiff did not suffer from any symptoms of hyperglycemia until 11:20 a.m., which is nearly 11 hours after Nurse Petrocelli saw the Plaintiff and over four hours after Nurse Petrocelli went off duty. (Defs.' Ex. G, Medical Chart; Kutz Dep. at 30.)

Moreover, and as admitted by the Plaintiff's own expert, the Plaintiff's average daily blood sugar level from 1995 through 1998 is best reflected in his hemoglobin A1c test scores. (Wright Dep. at 54.) The Plaintiff testified that his blood sugar levels in 1995–96 were the same as his blood sugar levels in 1997 and 1998. (*Id.* at 51–54.) Based on this information, the Plaintiff's average daily blood sugar level during 1995–1998 was 400 and even reached as high as 500. (Defs.' Ex. I, Hemoglobin A1c Results; Ex. J, Comparison Chart.) These blood sugar levels exceed the levels that the Plaintiff had at the Jail prior to 11:20 a.m.

Too, while the Plaintiff was at the hospital, his average blood sugar level was 232 and his blood sugar readings were as high as 308, 320, 333 and 361. (Defs.' Ex. H, Blood Sugar Levels.) This was so even though the Plaintiff was hospitalized and undergoing intensive insulin therapy. (Defs.' 56.1(a) Statement ¶ 69.) Even after insulin had been provided, the Plaintiff's blood sugar levels remained elevated.

Based on the evidence, the Plaintiff's blood sugar level for several years had been far in excess of 400. Despite Plaintiff's high blood sugar level, the Plaintiff has been able to go to work, drive his car, eat meals and sleep. (Defs.' Ex. I, Hemoglobin A1c Results; Ex. J, Comparison Chart; Wright Dep. at 61.) Thus, there is no basis in fact to suggest that the Plaintiff's blood sugar level was "dangerously high" at 361 and/or 374, where the medical evidence indicates that Plaintiff's average daily blood sugar level was normally in excess of 400.

Finally, to reiterate, a blood sugar level is dangerously high when the patient begins to exhibit signs and/or symptoms of hyperglycemia. Yet, the Plaintiff was stable and never exhibited any signs or symptoms of hyperglycemia prior to 7:00 a.m. when Nurse Petrocelli's (and Dr. Floro's) involvement with the Plaintiff ended. The medical chart as well as Nurse Petrocelli's, Nurse Boston's and Nurse Kutz's testimony indicated that the Plaintiff was stable and suffered no symptoms of hyperglycemia until later, at about 11:20 a.m.

In these circumstances, no fair minded jury could return a verdict for the Plaintiff on the issue of Plaintiff's blood sugar level.

**B. Nurse Petrocelli Did Not Err By Not Further Treating and Hospitalizing Plaintiff**

The Plaintiff next, essentially, charges that Nurse Petrocelli erred by leaving the Plaintiff in the general population and not transferring him to the hospital earlier. (Pl.'s Mem. at 10.) This court disagrees.

In preface, the Plaintiff's own expert never indicated that Nurse Petrocelli should have transferred the Plaintiff to the hospital or that Nurse Petrocelli acted improperly in not transferring the Plaintiff to

the hospital. Significantly, as indicated by the Jail's medical chart and Nurse Petrocelli, Nurse Boston, Dr. Floro and Dr. Wright's testimonies the Plaintiff was completely stable and, in fact, his blood sugar level actually decreased between 12:40 a.m. and 5:45 a.m. (Defs.' Ex. G, Medical Chart; Wright Dep. at 135–36.) All medical professionals involved in the case agree that during the relevant time period (12:40 a.m. to 5:45 a.m.) the Plaintiff was in stable condition and not exhibiting any signs of hyperglycemia. (Defs.' Ex. G, Medical Chart.)

Nurse Boston, a non-party, assessed the Plaintiff at 5:45 a.m. and found the Plaintiff to be stable. (Defs.' Ex. G, Medical Chart.) Nurse Boston testified that she took Plaintiff's blood sugar level reading which was 361. (Boston Dep. at 34–35.) She further testified that the Plaintiff was not exhibiting any signs or symptoms of hyperglycemia. (*Id.*) The Plaintiff's expert does not challenge or criticize Nurse Boston's assessment and treatment of the Plaintiff. (Wright Dep. at 103, 164–65.) Nurse Kutz, another non-party, assessed the Plaintiff at 10:30 a.m. and reached an identical conclusion as Nurses Petrocelli and Boston. Nurse Kutz also found that at 10:30 a.m. (over three hours after Nurse Petrocelli's shift had ended) that the Plaintiff was not suffering from any signs of symptoms of ketoacidosis. (Defs.' Ex. G, Medical Chart; Kutz Dep. at 44.)

In sum, non-party Nurses Boston and Kutz each assessed the Plaintiff independently after Nurse Petrocelli and determined, as did Nurse Petrocelli, that (until 11:20 a.m.) the Plaintiff was showing no signs or symptoms related to hyperglycemia which would require the Plaintiff to be transferred to the hospital.

## C. Nurse Petrocelli's Involvement with Plaintiff

Nurse Petrocelli's face-to-face involvement with the Plaintiff, was on December 5, 1998 at 12:40 a.m. At that time,

Nurse Petrocelli took the Plaintiff's vital signs, obtained a medical history from the Plaintiff, secured the Plaintiff's blood sugar level reading, confirmed that the Plaintiff had no other complaints, learned where the Plaintiff purchased his insulin so that he could verify the Plaintiff's prescription and arranged to have the Plaintiff's mother bring his prescription to the Jail so that Plaintiff's prescription could be verified before the Pharmacy opened. (Defs.' Ex. G, Medical Chart.)

Nurse Petrocelli also arranged to have Nurse Boston check on the Plaintiff at 5:45 a.m. and paged Dr. Floro about that time. Nurse Boston took another blood sugar level reading at about 5:45 a.m. and found that the Plaintiff's blood sugar level had slightly decreased. Like Nurse Petrocelli, Nurse Boston found that the Plaintiff was not exhibiting any signs or symptoms of hyperglycemia. She also verified that the Plaintiff did not have any other complaints and he did not state that he was not feeling well. (Defs.' Ex. G, Medical Chart; Boston Dep. at 30, 34, 38.)

In addition, at about 6:45 a.m., Dr. Floro returned Nurse Petrocelli's page. (Defs.' Ex G, Medical Chart, Petrocelli Dep. at 62–63, Wright Dep. at 131.) Dr. Floro gave orders to withhold administering insulin until the Plaintiff's prescription could first be verified. (Petrocelli Dep. at 71; Floro Dep. at 35.) Nurse Petrocelli followed Dr. Floro's orders and passed those orders on to the next shift. (Petrocelli Dep. at 71; Wright Dep. at 85–86, 103.) Furthermore, Nurse Petrocelli informed the next shift about the Plaintiff's condition and history. (Petrocelli Dep. at 71; Kutz Dep. at 19–21.)

The Plaintiff's expert himself admits that all of the Plaintiff's vital signs at 12:40 a.m. were normal when the Plaintiff was first assessed by Nurse Petrocelli. (Wright Dep. at 76–77.) When Nurse Petrocelli called Dr. Floro for orders the Plaintiff was not exhibiting any signs or symptoms of hyperglycemia. (*Id.*) There

is no medical evidence, in fact, that the Plaintiff's condition worsened between 12:40 a.m. when Nurse Petrocelli assessed the Plaintiff, and 7:00 a.m., when Nurse Petrocelli's shift ended. (Defs.' Ex. G, Plaintiff's Medical Chart; Wright Dep. at 136, 144, 146).

It is also undisputed that as a nurse, Nurse Petrocelli could not administer insulin without a doctor's order. (Petrocelli Dep. at 31, 38–39; Wright Dep. at 123; Boston Dep. at 19; Kutz Dep. at 38–40.) It bears noting that even *arguendo* if Nurse Petrocelli could decide to administer insulin to the Plaintiff, the dosage of insulin the Plaintiff told Nurse Petrocelli he was taking was incorrect. (Kutz Dep. at 42–43; Wright Dep. at 87.) It is further undisputed that Nurse Petrocelli could not call the Pharmacy (since it did not open until 9:00 a.m.) and that Nurse Petrocelli's suggestion that the Plaintiff's mother bring in his prescription was a means of verifying the Plaintiff's medication regime. (Petrocelli Dep. at 59; Wright Dep. at 59.) Finally, Dr. Floro testified that Nurse Petrocelli's treatment of the Plaintiff complied with the standard of care and Dr. Floro's orders to Nurse Petrocelli would have been the same regardless of when Nurse Petrocelli would have paged Dr. Floro. (Floro Dep. at 47, 58.)

Under Nurse Petrocelli's care, the Plaintiff was stable and his vital signs were normal. Nurse Petrocelli, who had 16 years of experience, was acting carefully by following a pattern of treatment (which was also followed by all of the nurses who assessed the Plaintiff) which was to verify the Plaintiff's prescription first. Furthermore, insulin is a dangerous drug and the Plaintiff told nurses at the Jail and Hospital three different stories regarding the type and dose of insulin that he was taking. (Wright Dep. at 87; Kutz Dep at 42–43.)

In assessing the exercise of professional judgment, courts have recognized that a constitutional claim of deliberate indiffer-

ence will not be found where other medical professionals have reached the same conclusion as the defendant. *Steele*, 82 F.3d at 177–78. The theory underlying these decisions is that a condition cannot be so "obvious" as to trigger civil rights liability where other professionals have reached the same conclusions as the defendant. As the Seventh Circuit recognized in *Steele*, "If two sets of outside doctors could draw the same (erroneous) conclusion, it is difficult at best to claim that another diagnosis was 'obvious.'" *Id.* at 179.

In the case at bar, Nurse Boston and Nurse Kutz both assessed the Plaintiff after Nurse Petrocelli. Both found that the Plaintiff's condition was stable and that the Plaintiff was not exhibiting any signs or symptoms of hyperglycemia. The fact that two non-party medical professionals corroboratively reached the same conclusion as Nurse Petrocelli and followed the same approach, demonstrates, *inter alia,* that Nurse Petrocelli's conclusions could not be "obviously" wrong.

In short, as a matter of law, the claim of deliberate indifference against Nurse Petrocelli cannot stand.

## II. Dr. Floro Is Entitled To Summary Judgment

■ Plaintiff alleges that Dr. Floro was deliberately indifferent to his serious medical needs because Dr. Floro did not return a page for "approximately six hours" (from 12:40 a.m. to 6:45 a.m.) and because Dr. Floro had an obligation "to insure that the plaintiff received his insulin." (Pl.'s Mem. at 6, 12.)

Dr. Floro had limited involvement with the Plaintiff and he never saw or examined the Plaintiff. The extent of his involvement with the Plaintiff was that he spoke with Nurse Petrocelli on the telephone at 6:45 a.m. on December 5, 1998 and, based on the Plaintiff's actual lack of symptoms ordered the nursing staff to verify the Plaintiff's prescription before administering insulin. (Defs.' Ex. G, Medical Chart;

Floro Dep. at 35; Petrocelli Dep. at 71.) In addition, Dr. Floro ordered that if the Plaintiff should exhibit signs of hyperglycemia that the Plaintiff should be transferred to the hospital. (Floro Dep. at 35.)

Plaintiff, as related, contends that on December 5, 1998, Dr. Floro was paged by Nurse Petrocelli at 12:40 a.m. and did not return the page for six hours. (Pl.'s Mem. at 3–4.) On the contrary, however, Nurse Petrocelli testified that he made a 12:40 a.m. medical chart entry that he would notify Dr. Floro for orders. Nurse Petrocelli testified that the chart entry merely meant that he intended to contact Dr. Floro at some point, but not immediately unless there was an emergency. (Petrocelli Dep. at 62–63.) The uncontradicted evidence is that Dr. Floro was first paged about 5:45 a.m. and that he returned the page by 6:45.a.m. (Defs.' Ex. G, Medical Chart; Petrocelli Dep. at 62–63; Wright Dep. at 131, 160–62.) Accordingly, the Plaintiff's allegation that Dr. Floro failed to return a page for six hours is unavailing.

The Plaintiff's assertion that Dr. Floro was obligated to insure that the Plaintiff received his insulin is also unavailing. According to Dr. Wright, Dr. Floro's order to verify the Plaintiff's prescription before administering insulin was "overly and unnecessarily cautious." (Wright Dep. at 100.) Dr. Wright, however, conceded that the Plaintiff gave the nurses incorrect information as to his prescription and that if a patient tells a medical professional inconsistent medication information, the professional must be even more careful regarding the administration of medication. (*Id.* at 87, 119.) A patient who gives inconsistent information regarding his medication history represents "a red flag to be careful." (*Id.* at 119.) Dr. Wright also admitted that insulin is a dangerous medication that, if administered improperly, can kill the patient and that a physician who administers insulin improperly acts "recklessly." (*Id.* at 87, 94.)

Given these undisputed facts, Dr. Floro was necessarily obligated to proceed cautiously when confronted with a patient who was stable and non-symptomatic, but who was admittedly sending "red flags." Dr. Floro also knew that the type and dose of the Plaintiff's insulin had to be verified to properly treat the Plaintiff. Dr. Floro wanted to verify the information first and the Plaintiff did not provide accurate information.

In the factual circumstances described, Dr. Floro's condition clearly cannot meet the standard for deliberate indifference.

Plaintiff's reliance on *Weyant v. Okst,* 101 F.3d 845 (2nd Cir.1996), respectfully, is misplaced. *Weyant* is clearly distinguishable from the instant case. In *Weyant,* Charles Weyant ("Weyant"), a severe diabetic, was arrested and placed in Defendants Peter Auberger ("Auberger") and George Okst ("Okst") police car for 30 minutes where he became very ill because he had not taken his required dosage of insulin. *Weyant,* 101 F.3d at 849. Following Weyant's arrest, he "was pale, dizzy, perspiring profusely, trembling uncontrollably, hardly able to talk and repeatedly lost consciousness." *Id.* at 857. Weyant's appearance was such that Auberger asked Weyant what was wrong. *Id.* at 849. Weyant told him that he was a diabetic, that he was overdue on his insulin and that he was in insulin shock. *Id.* Auberger said that he would take Weyant to a nearby hospital. *Id.* Auberger began to drive Weyant to a nearby hospital, but was stopped from doing so by Okst. *Id.* Okst, notwithstanding having been told that Weyant was a diabetic and having been told by Auberger that Weyant was ill, instructed Auberger to take Weyant to the police barracks, not to a hospital. *Id.* At the barracks, the only care Weyant received was from Auberger who brought him water. *Id.* at 850.

In those circumstances, the *Weyant* court found that there was a triable issue of fact with respect to the deliberate indif-

ference of the defendants. *Id.* at 857. Herein, the case facts, as described and discussed, *supra*, are plainly dissimilar and in sharp contrast to the *Weyant* case facts.

### CONCLUSION

In view of the foregoing, the court finds that no fair-minded jury could render a verdict against the Defendants. Therefore, Defendants Nurse Petrocelli and Dr. Floro's motion for summary judgment as to Count II of the Fourth Amended Complaint is granted and Count II is dismissed with prejudice.